**MARCUS et al. v. UNITED STATES.**

Nos. 6505, 6508.

United States Court of Appeals for the
District of Columbia.

Decided Nov. 9, 1936.

John H. Wilson and Albert Lyman, both of Washington, D. C., for appellants.

Leslie C. Garnett and Irvin Goldstein, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

An appeal from a conviction and sentence in a first degree murder case.

The appellants Willett Marcus and John Homer Cummings were convicted of murder in the first degree upon an indictment charging that on January 4, 1935, in the District of Columbia they deliberately and with premeditated malice, while perpetrating, or attempting to perpetrate, the offense of robbery, did shoot and kill one Joseph R. Wushnak. The defendants pleaded not guilty and trial was had resulting in the conviction of both defendants. Sentence was imposed upon them, and this appeal was then taken. It appears that on January 4, 1935, and for some time prior thereto, Joseph R. Wushnak was employed by a provision company in the city of Washington, D. C., to sell and deliver meats and provisions to its customers. And that at about 7 o'clock p. m., January 4, aforesaid, Wushnak, accompanied by an assistant named Frank was engaged in delivering meats by means of a truck to various stores within the District; that soon after 7 o'clock p. m. of that day Wushnak and Frank in the course of their duties arrived at the corner of Tenth and B streets, N. E. in the city of Washington and parked their truck on the northeast corner of the street crossing. Wushnak then went into a store at one corner of the street operated by one Katz and Frank went to a store on another corner operated by one Cullen; Frank returned to the truck and obtained some meat which he took to Cullen's store. Wushnak then returned to the truck from Katz' store for the purpose of obtaining meat and when he returned to the store he was suffering from a gunshot wound freshly inflicted upon his body. Wushnak was removed to the hospital where he died on January 8th, following, as a result of the wound. No one saw the actual firing of the shot which caused Wushnak's death but the report of the pistol was heard by Frank at Cullen's store and by Katz at the store which Wushnak had just left and to which he returned immediately after the shooting. An investigation was immediately begun by police officials aided by the finding of a hat which had been dropped in the truck by the assailant, and on January 11th the appellants, Marcus and Cummings were taken into custody, charged with the crime. Their indictment and trial followed.

At the trial the government, among other things, offered in evidence certain statements signed by defendant Marcus relating to the crime, reading in part as follows:

"I have been knowing John Cummings for about a month * * * The next thing I was down at 709 H St. NW working and I took sick there the Saturday before New Year 1935. John Cummings came over to my house at 607 A St. SE., to see me and then the following Friday John Cummings came back to see me in the morning and then he came back that evening. He asked me if I would go over to northeast Washington with him and I told him I would and before we left the house John Cummings asked me if I had his automatic pistol and I told him I did have it. He had previously left this automatic with me at my house. We leaves the house and when we gets down by Casualty Hospital, two white fellows were following us and we gets near 10th Street NE, and John Cummings says to me, 'There is the man now, give me the pistol', and John asked me if the pistol was loaded, and I told him it was like he gave it to me. Then I heard John Cummings clicking the gun a couple of times. Then the man to whom John was referring to got out of a tall red meat truck and was in the store and we stood there and then walked across the street and John Cummings disappeared somewhere and I didn't see him for about two or three minutes. When the man came out of the store I saw John Cummings following this man across the street. Then this man got in the truck at the front part of it. Johnny walks behind this man and gets in the truck behind the man. I ran over to the back of the truck and I heard this man say to John Cummings, 'You G D Black S O A B' and then I heard a shot and then I ran down 10th Street and turned west on C street, that is left on C Street and then we got a cab near Casualty Hos-

pital and I told the cab driver to carry us to 6th and A Streets SE., and I got out there at 6th and A Streets SE., and while I was running something was burning me in the chest and while I was running along I told John Cummings that I thought he had shot me and then he asked me if I could make it and I told him yes. This burning in my chest happened while I was running from the truck to the taxicab. I got out of the cab at 6th and A Streets SE. and I started home and went in the house where I live at 607 A Street SE. That is the house where I was rooming at that time and now I am living at 1226 Minnesota Ave. NE.

" * * * I didn't see John Cummings any more for about three or four days and then he came in and there was a paper already at the house and I had it and I read an article in the paper about this hold-up that Jimmy and I had pulled and the article stated that the hold-up men had taken about $100.00 or something like that. It didn't say anything about the man being dead at that time. I asked Johnny who got the $100.00 and John said that he didn't get it. I stayed in the bed on account of my cold. * * * That is all, only after I was arrested I was questioned about an automatic pistol and then I carried the officer to the kitchen at 1226 Minnesota Ave. NE., where I got this automatic pistol from the second drawer of an old bureau and turned it over to the officer. That is all of it. * * *

"Q. Who did the gun belong to? A. As far as I knew, it belonged to John Cummings.

"Q. Did John tell you where he got the gun? A. No, sir.

"Q. Would you know that gun if you was to see it again? A. Yes, sir.

"Q. I am now showing you a .32 caliber Savage automatic pistol No. 193132 and ask you if this is the gun you turned over to John Cummings near 10th and B Streets NE., last Friday night January 4, 1935? A. Yes, sir; that is the gun.

"Q. When did John Cummings leave this gun with you previous to the hold-up and shooting at 10th and B Streets NE., January 4, 1935? A. I kept it until he asked me for it January 4, 1935, while going down B street NE.

"Q. Who suggested holding up and robbing the meatman at 10th and B Streets NE? A. John Cummings and I agreed to it. * * *

"Q. What conversation took place between you and John Cummings after the shot and after you and John Cummings left the truck? A. I asked John Cummings if he shot that meatman and John Cummings said he believed he did but he didn't know for sure.

"Q. Did you ask John Cummings why he shot the meatman? A. No, sir."

The government also offered in evidence a statement signed by defendant Cummings which contained among others the following statements: "About a month ago, I met Willett Marcus, colored, at a gas station at 8th and H Streets N. W. I met him through Trice, who works at that gas station. * * * After we met, me and Marcus talked it over as to how we could make some easy money. During our conversation I told Marcus that I had a gun. * * * Later on I went over to Willett's house at 607 A Street S. E., and we talked over a job. Willett told me that he needed $22.00. Then he told me about the meatman after I had told him about the meatman first. This talk about the meatman went on with me and Willett Friday morning, January 4, 1935, and Willett Marcus tole me to be back about 6 o'clock P. M., January 4, 1935, and we would get him or get something. I came to Willett's house at 607 A Street S. E., about six P. M., January 4, 1935, and Willett was there. We killed a little time around there and about 6:30 P. M. we left the house there and Willett had the gun when we left the house. We walked around two or three blocks, heading for 10th and B Streets N. E. * * * Willett and I were going up B Street, between 9th and 10th Streets N. E. and we noticed this meatman's truck parked at the northwest corner of 10th and B Streets N. E. Willett asked me if I was going to stick him up or if he was going to stick him up, and I told Marcus if he didn't want to, to give me the gun. Willett then gives me the gun and I asked him if it was loaded and he said he reckoned it was and I snapped the slide back one time and I threw the shell up in a barrel of the gun. Then Willett Marcus and I went up to the corner of 10th and B Streets N. E., and then we talked it over as to how we were going to get him. We decided that we were going to get the meatman when he came to the truck and while wait-

ing for him to come to the truck we saw another little white fellow come from a store on another corner and get in the truck and get some meat and go back to another store across the street. I kept up B Street, towards 11th Street N. E., and Willett turned at 10th Street N. E. I stopped up there waiting for the man to come out and Willett came up to B Street between 10th and 11th Streets N. E., where I was at. Willett told me there were two of them on the truck and I told him I saw the other fellow. Then the both of us decided to get the meatman just as soon as he went back to the truck and while we were standing there the meatman came out of the store and went over and got in his truck and I went right behind him and the meatman was in the truck with his back to me. Well, I told him to stand where he is; at that time I had the gun in my hand. It was a narrow truck and he could hardly turn around, and he commenced backing up, and I backed up, and when he turned around he hit me with his fist on the side of the head and he knocked my hat off of my head, and at that time the gun which I had in my hand went off and just as it did the meatman called me a black son-of-a-b and I jumped out of the truck then and just as I got to the back of the truck, Willett, he was standing right at the back of it. Then Willett Marcus and I started running back up 10th Street N. E., and turned left at C Street, N. E., and while we were running Willett asked me if I shot the meatman and I told him I didn't know and Willett told me that I shot him."

The defendant Cummings also gave the following answers to questions then put to him:

"Q. How did you know the meat truck would be in the vicinity of 10th & B Streets N. E., around that time—January 4, 1935? A. Willett and I had seen it there before around that same time. * * *

"Q. What were your intentions when you told the meatman to stand where he was when you had the gun on him? A. To rob him of his money.

"Q. Did you get his money? A. No, sir.

"Q. How many shots did you fire? A. One."

The defendants at the trial objected to the introduction of these confessions upon the ground that they were not correct and were given under duress. They claimed that Marcus signed his confession when threatened with a whipping in the event he refused to sign, and that Cummings signed his after being actually beaten. These statements were denied by the following witnesses, who were present at the time when defendants signed their statements: Officers Flaherty, Strange, Ellery, Lieutenants Cox and Darnall. These witnesses all testified that no threats were made to either defendant at the time, nor was either one whipped or beaten, but both were rightly informed that their statements would be used in the trial of the case and that no statement should be made except voluntarily by the witness.

The court upon consideration of the evidence concerning the signing of the confessions admitted them as evidence in the case. We think there is no error apparent in this ruling.

Defendant Cummings, taking the stand in his own behalf, testified in part that he signed the alleged confession without reading it, and after the officers had beaten him; that he did not know that there was any one in the truck, but went to the truck to take a little meat and that while doing this a man inside of the truck cursed him and hit him, and that he pulled his gun and it went off, and that he did not shoot the man intentionally, but that the gun went off when he fell against the truck; that he did not plan with Marcus to commit a robbery; and that he did not tell any one that he planned to do that. He testified that he did have a pistol at that time and that he told Marcus that he had a pistol, and Marcus told him he knew where they could get a little money; that Marcus told him he knew a boy who had a bicycle he could have for around $25; that on January 4th he had no conversations with the defendant Marcus about a holdup; that on the day in question they were going to a man's house to gamble; that he had seen this meat truck in the northeast section on at least one occasion before the day of the shooting; that on the day of the shooting they were on their way to the place to gamble; that he had asked Marcus for the gun and Marcus gave it to him; that there was a man behind them and he thought the man might be following them and for that reason he asked Marcus for the gun; that he received the gun from Marcus at Ninth and B streets; that he did not expect to

see the meat truck at Tenth and B and was not looking for it, and didn't know anything about its being there; that he and Marcus went down to the truck to steal something off of it; that he did not see any one on the truck and thought that no one was in the truck; that he went to the truck and took the gun out of his pocket when the man on the truck saw him and started towards him with his fists; that he took the gun out before the man hit him; and that he and Marcus both agreed to go down and steal meat off of the truck.

Thereupon the defendant Marcus testified as a witness in his own behalf substantially as follows: That he was born and reared in Washington 'and had never before been arrested for a criminal offense; that he had known Cummings for some time and that on the day in question he and Cummings were going to a crap game at the home of a man named Kent on Ninth street, and that they were taking the pistol along to protect the money if they won any; that when they left the home of Marcus, Marcus had the gun and $2.60 on his person; that when they approached the corner of Tenth and B streets, Cummings suggested taking something from the truck; that witness thereupon said, "No, Cummings; here is your pistol; if you are going to do anything like that I don't want to have anything to do with it"; that witness went across the street and was looking for a cab to go home when Cummings caught up with him and because he was afraid of Cummings, he pretended that Cummings had never seen Mr. Wushnak, and had never before in his life seen the truck; that when he made his statement at headquarters it was the same as his present testimony; that he signed the confession because the officers said that they would whip him if he did not.

It appears that, when the confessions were read to the jury at the trial, certain parts thereof were omitted and were not made known to the jury. These parts consisted of statements made by the defendants of former holdups jointly committed by them and other crimes not connected with the crime under consideration. Counsel for the defendants conceded that these narratives of other crimes should not·be read to the jury, but contended that the omissions of such parts made the entire confession inadmissible. We think this position is untenable and that the court did not err in overruling it.

When the confessions were first introduced in evidence in the trial the court held that each statement was competent not only as evidence against the one signing it but also against his codefendant. The court based this ruling upon the fact that the defendants were both present at the time when the several confessions were made, and that neither one objected to the statements made by the codefendant, and that in the absence of such objection or contradiction it would be taken as a quasi admission by each defendant that the statements of his codefendant concerning him were correct. Later, however, in the course of the trial, the court reversed its ruling upon this point and fully and clearly informed the jury that the statement of each defendant was to be received as testimony concerning himself alone, and not as affecting his codefendant. In view of the clear and emphatic explanation upon the point delivered by the court to the jury, there can be no doubt that the jury fully understood it. Moreover, inasmuch as both statements were admitted in evidence and contained no contradictory statements concerning the twò defendants it cannot be said that the jury could be misled by the first ruling of the court.

In the course of the trial testimony was received tending to show that the defendants obtained a hat, which was found at the place of the crime, and also an overcoat and the pistol, by means of 'thefts committed by them at a former time and place. These articles were used at the trial as tending to identify the defendants as the assailants. It is contended by appellants that such references to former crimes committed by them were prejudicial and erroneous and should not have been admitted in evidence. We find no error, however, in the ruling of the court upon the subject, for in a full and complete manner the court instructed and warned the jury that such evidence was introduced solely for the purpose of identifying the ·articles in question, and that the manner in which they were first obtained by the defendants was not to be considered as reflecting upon them in any manner or to any extent. We think that this careful admonition of the court was sufficient to guard·the rights of the defendants in this particular.

■ The record discloses that the indictment contains three counts which were identical in terms except that in one count it was alleged that the pistol was fired by the hand of Marcus. In another count it was alleged that it was fired by the hand of Cummings, whereas in the third count it was alleged as held by the hand of one of the parties unknown to the grand jurors. At the trial a motion was filed by defendants requesting the court to order the government to state which one of these counts it relied upon for a conviction. The court refused to sustain this motion. We think that this caused no prejudicial error to the defendants. The testimony made it plain without contradiction that the pistol was held in the hand of Cummings. This was the statement of both parties.

■ The instructions given by the court to the jury in the case were full, complete, and correct. Among other things the court said:

"Murder in the first degree is the intentional killing of another while attempting to perpetrate an offense punishable by imprisonment in the penitentiary. That is the charge in the indictment—that they were attempting to perpetrate the offense of robbery. Robbery, as I told you, as a matter of law is punishable by imprisonment in the penitentiary in this District, and robbery is defined as the taking from a person or from the immediate, actual possession of another anything of value by force or violence, whether against resistance or by putting in fear. So that the elements of the offense of murder in the first degree would be these: First. That the defendants were attempting to commit a robbery; Second. That while so doing one of them shot the decedent Wushnak; Third. That Wushnak died as the result of the wound; Fourth. That the defendant who fired the shot intended to kill; Fifth. And that the shooting was within the scope of the agreement which the defendants had made to commit· the offense of robbery. Each of those elements must be established beyond a reasonable doubt. * * *

"In the first place, as you know, every man charged with a crime is presumed to be innocent, and that presumption continues with him until it has been overcome by evidence beyond a reasonable doubt. The burden of proof is upon the Government to establish the case beyond a reasonable doubt. You have heard that expression so many times and have sat in so many cases that I think you know what it is, but as a matter of precaution I will restate the law to you on that subject.

"By reasonable doubt is meant such a doubt as will leave your minds, after a fair, candid, and impartial investigation of all the facts in the case, so undecided that you are unable to say that you have an abiding conviction of the guilt of the defendant; or, as otherwise expressed, such a doubt as in the graver and more important transactions of life would cause a reasonable and prudent man to hesitate and pause. * * * If you can reconcile the evidence in the case with any reasonable hypothesis consistent with innocence, it is your duty to do so."

The defendants requested the court to instruct the jury upon the subject of manslaughter. This the court refused to do upon the ground that a verdict of manslaughter could not lawfully be predicated upon the conceded facts in the case. The court covered this subject in his charge to the jury as follows: "The defendant Cummings testified that after pulling out the pistol he did not intentionally shoot at Wushnak, but the pistol went off in some way which he does not know. He admitted that while he was armed with that pistol he was engaged in an attempt to steal meat from this truck. That was an unlawful act. When the deceased, Wushnak, attempted to prevent Cummings from stealing either meat or money, Cummings had no legal right to defend himself. So the fact that the pistol went off accidentally, if it did, would not make him guiltless of any offense. In order to make the offense murder in the first degree there must be an actual purpose or intent to kill. If you conclude from all the evidence that Cummings did not have a purpose to kill, either that he did not have that purpose or that the pistol went off accidentally, then he would not be guilty of murder in the first degree, but would be guilty of murder in the second degree."

This instruction to the jury was correct for the testimony in the case was sufficient to sustain a verdict of guilty of murder in the first degree or in the second degree, but would not in law justify a verdict of manslaughter. Sparf and Hansen v. United States, 156 U.S. 51, 715, 15 S.Ct. 273,

39 L.Ed. 343; Davis v. United States, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750; Andersen v. United States, 170 U.S. 481, 18 S.Ct. 689, 42 L.Ed. 1116; Horton v. United States, 15 App.D.C. 310, 311.

Under the common law of England the crime of murder was not subdivided into degrees as by our statute, but was defined by Coke and Blackstone as follows: "When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied." The penalty was death. Cooley's Blackstone (4th Ed.) vol. 2, p. 1361. On the other hand, manslaughter was defined as "The unlawful killing of another without malice either express or implied." Id. 1358.

The common law of England regarding murder was adopted at an early date as the law of Maryland, and afterwards was adopted as the law of the present District of Columbia.

"The common-law procedure, in all matters relating to crime, was in force at the date of the cession of this District by the State of Maryland, and still continues in force here in all cases except where special provision is made by statute to the exclusion of the common-law procedure. All crimes, therefore, and their appropriate and settled forms of procedure for enforcement, known to the common law, except as otherwise provided by statute, are still in force in this District. Such has been the recognized and adopted view of the subject, both by the courts and the Congress of the United States, ever since the organization of the District as the seat of government. Hence, the act of Congress of March 2, 1831 (4 Stat. at L. 448, chap. 37), known as the penal or crimes act, recognized preexisting crimes and prescribed the punishment therefor, but did not undertake to define and declare such offenses ab initio." Hill v. United States, 22 App.D.C. 395, 401.

Accordingly, under the common law of this District, an unlawful homicide with malice expressed or implied was murder whether with or without premeditation, deliberation, or an express purpose to kill.

The present division of the crime of murder into first and second degrees was afterwards enacted in section 798 et seq. of the Code of Laws of this District (1901), which went into operation from and after the first day of January, 1902, providing as follows:

"Sec. 798. *Murder In First Degree.*—Whoever, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate any offense punishable by imprisonment in the penitentiary, kills another, is guilty of murder in the first degree.

"Sec. 799. * * *

"Sec. 800. *Murder In Second Degree.*—Whoever with malice aforethought, except as provided in the last two sections, kills another is guilty of murder in the second degree.

"Sec. 801. *Punishment.*—The punishment of murder in the first degree shall be death by hanging. [Now electrocution, 43 Stat. 798.] The punishment of murder in the second degree shall be imprisonment for life, or for not less than twenty years."

It therefore appears that if, as claimed by Cummings, the firing of the pistol was accidental under circumstances described by him, the law would nevertheless imply malice from the circumstances to his action and the crime being with malice would be murder and not manslaughter, for as aforesaid manslaughter is an unlawful homicide without malice.

The homicide according to the statement of Cummings himself, when testifying in his own behalf at the trial, occurred under the following circumstances: "That he did not know that there was anyone in the truck, but went to the truck to take a little meat and that while doing this, a man inside of the truck cursed him and hit him, and that he pulled his gun and it went off, and that he did not shoot the man intentionally, but that the gun went off when he fell against the truck; * * * that he and Marcus went down to the truck to steal something off of it; that he did not see anyone on the truck and thought that no one was in the truck; that he went to the truck and took the gun out of his pocket when the man on the truck saw him and started towards him with his fists; that he took the gun out before the man hit him; and that he and Marcus both agreed to go down and steal meat off of the truck."

It appears from other testimony in the case uncontradicted by Cummings that the

"gun" was a .32-caliber Savage automatic pistol; that the occurrence took place in the nighttime; and that the deceased had no weapon, but used his fists only.

If it be conceded that the statement of Cummings is true, it nevertheless discloses a wicked criminal purpose on the part of Cummings, for under these circumstances *the law presumes that Cummings, while attempting to perpetrate a robbery, foresaw and intended whatever consequences might naturally result from such an encounter.* The law, not as a matter of fact, but as a conclusion of legal reasoning and experience, considers this state of mind to be implied malice. Consequently, the homicide would not be manslaughter, which is, as aforesaid, an unlawful killing without malice either express or implied, but would be murder either in the first or second degree as would be found by a consideration of all the evidence in the case. "A wrongful act is malicious if the injurious consequences following it are those which might naturally be expected to result from it, and which the person doing the act must be presumed to have had in mind at the time. In other words, while actual malice is ordinarily a question of fact for the jury, legal malice is a presumption of law, and, though it might be true that in the commission of an unlawful act the defendant was not actuated by hatred or revenge or passion toward the plaintiff, nevertheless, if he acted wantonly, doing what any man of reasonable intelligence must have known to be contrary to his duty, and purposely prejudicial and injurious to another, the law will imply malice. The presumption of malice, from a wrongful and injurious act wilfully done, is not an arbitrary, technical, or artificial rule invented for the particular occasion, but is the result of a mode of legal reasoning which is of general application, and has been said to be a natural inference drawn by a fair course of reasoning, from the laws of nature, the experienced course of human conduct and affairs, and the connection usually found to exist between certain things, and, in this respect, standing on the same footing as inferences from the known laws of nature. It is sometimes called malice in law, in contradistinction to malice in fact, because the law draws the inference from the fact." 18 R.C.L. 4; Commonwealth v. York, 9 Metc. (Mass.) 93, 43 Am.Dec. 373.

In the case of Norman v. United States, 20 App.D.C. 494, it appeared that the deceased was attempting to escape from the defendant, who was violently beating her, and in her effort to escape she fell into a canal and was drowned. The defendant was convicted of murder. This court in its opinion (20 App.D.C. 494, at page 499) affirming the conviction said: "Under the circumstances, in order to convict the defendant of felonious homicide, it was not necessary that the prosecution should show or that the jury should believe that the defendant had the malicious intent actually to do bodily harm to the deceased or to take her life. As a proposition of law, the defendant was guilty of murder under the second count of the indictment, if, in seeking to escape his violent assault upon her, the deceased had a well-grounded belief. that the defendant intended to take her life or inflict further serious bodily injury upon her, and so believing inadvertently fell into the canal and was drowned."

In Sabens v. United States, 40 App.D. C. 440, 442, this court held: "It thus appears that Congress has established two degrees of murder in this jurisdiction, one punishable by death, and the other by imprisonment for life, or not less than twenty years. To constitute murder in the first degree the act must have been committed wilfully, deliberately, maliciously, and premeditatedly; and these concomitants are presumed to have been present when poison was intentionally administered, or when the killing resulted from the perpetration, or attempted perpetration, of any offense punishable by imprisonment in the penitentiary, or when death ensued from the placing of an obstruction on a railroad with the above-mentioned intent. In other words, a deliberate intent to take life is declared to be an essential element of murder in the first degree, and this, of course, must be shown as a fact. While implied malice at common law was sufficient to make an offense murder, under our statute, which requires proof of actual malice, implied malice constitutes murder in the second degree."

See, also, Travers v. United States, 6 App.D.C. 450; Hill v. United States, supra; Hamilton v. United States, 26 App. D.C. 382; United States v. Evans, 28 App. D.C. 264; State v. O'Hara, 92 Mo. 59, 4 S.W. 422; People v. Slover, 232 N.Y. 264, 133 N.E. 633; McKee v. State, 82 Ala. 32,

2 So. 451; Skipper v. State, 144 Ala. 100, 42 So. 43; Lawson v. State, 155 Ala. 44, 46 So. 259; People v. Venckus, 278 Ill. 124, 115 N.E. 880; People v. Hobbs, 297 Ill. 399, 130 N.E. 779; Wilson v. State, 49 Tex. Cr.R. 50, 90 S.W. 312.

The defendant Marcus at the trial requested the court to charge the jury as follows: "If the defendants agreed to commit the crime of petit larceny by stealing meat from the truck and that no force or use of arms was contemplated in the agreement, then the defendant, Marcus, is not liable for the consequences of a shot fired by Cummings, provided you find from the evidence that the only understanding and agreement was to commit the crime of petit larceny without the use of force or arms."

The court refused to deliver this instruction to the jury, and we think this ruling was not erroneous. The testimony discloses that Marcus knew that Cummings was to use a pistol if necessary in accomplishing his unlawful actions. An effort was made, however, to show that Marcus retired from participation in the transaction and upon this claim the court instructed the jury as follows: "In other words, if after a man has entered into an agreement with another person to commit a crime, before the crime has been done he honestly and in good faith withdraws and tries to get away and does not take any part in the offense, then he is not guilty if the other one does go ahead and commit the offense which they had originally intended to commit."

We think that in this instruction the court fairly presented to the jury the real claim of Marcus in respect to his participation in the crime. It may be added that in section 908 of the Code 1901 (D.C.Code 1929, T. 6, § 5) the following provisions appear:

"Sec. 908. *Persons Advising, Inciting, or Conniving at Criminal Offense to be Charged as Principals.*—In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be."

After a careful review of all the questions involved in this case we are convinced that the judgment of the lower court should be, and it hereby is, affirmed.

Affirmed.