UNITED STATES of America

v.

Aubrey WHARTON, Appellant.

No. 22433.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 6, 1969.

Decided Jan. 5, 1970.

Mr. A. Alvis Layne, Washington, D. C. (appointed by this court) for appellant.

Mr. Philip L. Kellogg, Asst. U. S. Atty., for appellee. Messrs. David G. Bress, U. S. Atty. at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, and Clarence A. Jacobson, Asst. U. S. Atty., were on the brief for appellee.

Before BURGER*, LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Appellant was indicted and tried on counts of first degree murder[1] and carrying a dangerous weapon without a license.[2] On the first count, after receiving instructions affording a choice of verdicts ranging downward from first degree murder to acquittal by reason of self-defense, the jury found appellant guilty of murder in the second degree. On the second count, the jury found him guilty as charged, a determination he does not seek to disturb. The trial judge imposed a sentence of imprisonment for a term of from 15 to 45 years, and this appeal followed.

Appellant attacks the murder conviction on several different grounds. We deal primarily with two, both relating to instructions by the trial judge to the jury affecting the legal definition of malice[3] as an essential element of murder. We find that the instructions were doubly erroneous and, upon review of the entire record, that the errors operated prejudicially to appellant. We accordingly reverse the second degree murder conviction and remand the case for appropriate action.[4]

I

Appellant admitted firing the three pistol shots that ended the life of the deceased, Walter McQueen. Appellant insisted that he did so in self-defense, while the Government, as we have indicated, averred deliberate and premeditated murder. The death scene was a vacant lot on a Sunday morning, where a group of at least five persons had congregated about a parked truck. It appears without dispute that all parties had been drinking, and that two, Harriet B. Goodwin and McQueen, were engaged in a dice game in the back of the truck. Beyond this, the descriptions of the shooting related at trial progressively diverged.

According to Mrs. Goodwin, appellant came onto the lot and sought but was denied admittance to the dice game in progress. Appellant left but returned within a few minutes, pulled out a pistol and shot McQueen. As the latter ran away, the witness turned her head, and heard but did not see additional shots. Samuel Bennett, who lived across the street from the lot, also heard a shot, and a bit later saw appellant, arm outstretched, raise the pistol to eye level and fire again at McQueen as he endeavored to flee.

A third Government witness, Daniel Wood Minor, admittedly a close friend of the deceased, gave a more elaborate account. Appellant had entered the dice game, but after losing two dollars had left, and was later denied readmittance by McQueen. At this point, appellant went to his car, removed the pistol from the trunk and placed it under his belt.[5] He returned, drew the pistol, but was admonished by Minor to put it away

---

* Circuit Judge (now Chief Justice) Burger did not participate in the disposition of this case.

1. D.C.Code § 22–2401 (1967).

2. D.C.Code § 22–3204 (1967).

3. Other contentions presented by appellant are discussed infra notes 8–9.

4. See notes 64–65, infra, and accompanying text.

5. In this respect, Minor's testimony differed from Mrs. Goodwin's. She stated only that appellant left the scene and shortly thereafter returned, mentioning nothing about the car or removal of a weapon therefrom. And see note 6, infra.

because "[i]t don't make no sense." Appellant then replaced the gun under his belt, walked around to face McQueen, and shot him. McQueen ran, and appellant shot him again; McQueen fell to the sidewalk and, as he lay there, appellant shot him a third time. There had been, Minor said, no argument or fight between appellant and McQueen.

Appellant, the sole defense witness, stakes his claim to a different version. He was gambling with McQueen when a dispute arose over whether appellant had "made that point." When appellant reached for the money he assertedly had won, McQueen slugged him in the mouth, knocked him down and kicked him. Fearful that McQueen was coming at him again, appellant drew a pistol [6] and shot McQueen three times, the total number of cartridges in the pistol. After the shooting, appellant drove off in his car, threw the pistol away, and on the following day surrendered to the police. At his preliminary hearing, he exhibited a cut lip and a loose tooth to the United States Commissioner, and attributed them to McQueen's attack.

McQueen died, during emergency surgery, later on the day of the shooting. An autopsy revealed that three bullets entered his body: at the left flank, the right back and the side. These wounds caused massive hemorrhaging which produced shock, from which death ensued. A blood test revealed an alcoholic content at a level generally classified in the intoxicating range, but no lacerations on his hands or arms were noted.

The trial judge charged the jurors on the elements of first and second degree murder, manslaughter and self-defense, explaining that the verdict should represent whichever one of those four possibilities that accorded their view of the evidence. Over appellant's objection, the judge left to the jury's discretion the question whether the death penalty should follow [7] in the event of a verdict of first degree murder.[8] While

---

6. Appellant testified that he had been carrying the pistol the entire morning, having taken it from his car before lending the car to his nephew.

7. The Government maintained a position of neutrality on the death penalty, neither recommending nor decrying it as an appropriate punishment in the event of appellant's conviction of first degree murder.

8. Appellant challenges, on a variety of grounds, the constitutionality of D.C. Code § 22–2404 (1967), which authorizes the death penalty on conviction of first degree murder. See Maxwell v. Bishop, 398 F.2d 138 (8th Cir. 1968), cert. granted, 393 U.S. 997, 89 S.Ct. 488, 21 L.Ed.2d 462 (1968), reargument ordered, 395 U.S. 918, 89 S.Ct. 1768, 23 L.Ed.2d 236 (1969). See also United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); Bailey v. United States, 132 U.S.App.D.C. 82, 86, 405 F.2d 1352, 1356 (1968), with which compare Calloway v. United States, 130 U.S. App.D.C. 273, 276 n. 4, 395 F.2d 1006, 1009 n. 4 (1968). Appellant also contends that the trial judge erred in excusing two prospective jurors when on voir dire they voiced reluctance to serve in a capital case. See Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). See also Bumper v. North Carolina, 391 U.S. 543, 88 S. Ct. 1788, 20 L.Ed.2d 797 (1968); Springfield v. United States, 131 U.S. App.D.C. 166, 403 F.2d 572 (1968); Bailey v. United States, supra, 132 U.S. App.D.C. at 85, 405 F.2d at 1355.

We have no occasion, however, to reach these issues, or to determine whether, because appellant's conviction was not of first degree but of second degree murder, he would in any event stand to gain from their consideration. See Bailey v. United States, supra, 132 U.S.App.D.C. at 83, 405 F.2d at 1352; Springfield v. United States, supra, 131 U.S.App.D.C. at 167–168, 403 F.2d at 573–574; Calloway v. United States, supra. See also Duckett v. United States, 133 U.S.App. D.C. 305, 307, 410 F.2d 1004, 1006 (1969) (dissenting opinion). Our disposition of this appeal is a reversal of appellant's conviction on account of errors in the trial court's instructions to the jury, and a remand which will lead at most to a new trial. See text infra at notes 64–65. It is crystal clear that, on the remand, appellant cannot be tried for any offense higher than second degree murder. Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119 (1957). Compare North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23

deliberations were under way, the judge complied with the jury's specific request for reinstruction on the three degrees of homicide, but denied appellant's bid for reinstruction on self-defense as well.[9] As we have stated, the jury fixed appellant's guilt at murder in the second degree.

## II

■ It is against a background deeply rooted in history that appellant's principal grievances on this appeal—alleged instructional errors—must be scrutinized. At common law, murder was unlawful homicide done with "malice aforethought;"[10] done without it, the crime was manslaughter.[11] Adoption of these doctrines as part of the law of the District of Columbia[12] has preserved this basic distinction,[13] although time has eroded literalness from "aforethought" as an ingredient of the distinguishing criterion.[14] So it is that today we find malice[15] as the sole element differentiating murder from manslaughter.[16]

The passage of time has also witnessed the legislative refinement of murder into two degrees unknown to the common

L.Ed.2d 656 (1969). Consequently, no expression by this court on the capital issues appellant poses could assist the ultimate resolution of this litigation. Compare Wright v. United States, 131 U.S. App.D.C. 279, 284, 404 F.2d 1256, 1261 n. 28 (1968). We are not inclined to volunteer views on serious constitutional questions already doomed to an early grave. See Doremus v. Board of Education, 342 U.S. 429, 432–433, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

9. During the course of its deliberations, the jury asked the trial judge to give further instructions on the elements of first degree murder, second degree murder and manslaughter. The judge responded by repeating, with but slight modification, see note 62, infra, the portions of the original charge related to those subjects. After this had been done, appellant objected to the further instructions because no reference was made to his self-defense claim, which the jury had not mentioned in its request. Concomitantly, appellant sought additional reinstruction as to the possible effect that evidence bearing on that claim might have on the existence of malice. This the judge refused to do, observing that the jury's request had been met and that more information would be given the jury if it expressed a wish for it.

The feasibility and scope of any reinstruction of the jury is a matter residing within the discretion of the trial judge. Whiting v. United States, 321 F.2d 72, 75 n. 3 (1st Cir.), cert. denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963); United States v. Salter, 346 F.2d 509, 512 (6th Cir. 1965); Allen v. United States, 186 F.2d 439, 444 (9th Cir. 1951). As the trial judge told the jury in the original charge, all of the court's instructions were to be read and considered as a whole. E. g. Whitt v. United States, 261 F.2d 907, 909 (6th Cir. 1959). We find no abuse of discretion in here limiting reinstruction to a direct response to the jury's request. Whiting v. United States, supra; United States v. Salter, supra.

10. Fisher v. United States, 328 U.S. 463, 472, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176 (1946); Austin v. United States, 127 U.S.App.D.C. 180, 184, 382 F.2d 129, 133 (1967); Naples v. United States, 120 U.S.App.D.C. 123, 132, 344 F.2d 508, 517 (1964).

11. Fisher v. United States, supra note 10, 328 U.S. at 472–473, 66 S.Ct. 1318; Marcus v. United States, 66 App.D.C. 298, 304, 86 F.2d 854, 860 (1936). See also the cases cited infra note 16.

12. See Fisher v. United States, supra note 10, 328 U.S. at 472–473, 66 S.Ct. 1318; Marcus v. United States, supra note 11, 66 App.D.C. at 304, 86 F.2d at 860; Hill v. United States, 22 App.D.C. 395, 400–402 (1903).

13. See note 16, infra, and accompanying text.

14. Austin v. United States, supra note 10, 127 U.S.App.D.C. at 184, 382 F.2d at 133.

15. See Belton v. United States, 127 U.S. App.D.C. 201, 204–205, 382 F.2d 150, 153–154 (1967); Fryer v. United States, 93 U.S.App.D.C. 34, 38 n. 18, 207 F.2d 134, 138 n. 18, cert. denied, 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389 (1953).

16. Green v. United States, 132 U.S.App. D.C. 98, 100, 405 F.2d 1368, 1370 (1968); Fryer v. United States, supra note 15, 93 U.S.App.D.C. at 38, 207 F.2d at 138; United States v. Hamilton, 182 F.Supp. 548, 551 (D.D.C.1960).

law.[17] Unlawful homicide committed with "deliberate and premeditated malice" is murder in the first degree;[18] committed with malice, but without deliberation and premeditation, it is murder in the second degree.[19] The tripartite division of unlawful homicide into murder in two degrees and manslaughter, and the role assigned to malice in the classification, assume progressive importance as we proceed through an examination of appellant's contentions.

Two passages in the trial judge's instructions to the jury are identified as targets of appellant's main assault on his conviction. Each appeared in the trial judge's original charge and as well in the portion thereof later repeated at the jury's request. Both passages were erroneous, and we have so held in a series of recent cases.[20]

The first of the impugned passages was:

*In determining whether a wrongful act is intentionally done and is, therefore, done with malice aforethought,* you should again bear in mind that every man is presumed to intend the natural and probable consequences of his own act.[21]

In charging that "a wrongful act * * * intentionally done * * * is * * * done with malice aforethought," the judge equated intent with malice, an essential ingredient of murder. In Green v. United States,[22] we condemned an instruction in practically identical language, declaring that

A wrongful act intentionally done is not * * * done with malice. Omitted from this definition of malice is the element of wilfulness, which the court elsewhere included in its definition of malice,[23] or that the intentionally done wrongful act was without justification or excuse.[24]

We also pointed out the harmful propensity of such an instruction:

An element of both degrees of murder is malice; but malice is not an element of manslaughter. Yet manslaughter may be and often is the intentional commission of a wrongful act. From a legal standpoint, therefore, when the court advised the jury that a wrongful act intentionally done is done with malice the effect, unless appellant were found not guilty, was to take the case out of the category of manslaughter and place it in the category of murder, notwithstanding on the facts there was an issue of manslaughter for the jury.[25]

We accordingly reversed Green's conviction and remanded the case for a new trial.[26]

The second instructional passage complained of by appellant was:

If in a prosecution for homicide it is shown that the accused used a deadly weapon in the commission of the homicide, *the law infers or presumes from the use of such weapon,* in the absence

---

17. Naples v. Untied States, *supra* note 10, 120 U.S.App.D.C. at 131–132, 344 F.2d at 516–517; Bullock v. United States, 74 App.D.C. 220, 221, 122 F.2d 213, 214 (1941), cert. denied, 317 U.S. 627, 63 S. Ct. 39, 87 L.Ed. 507 (1942).

18. D.C.Code § 22–2401 (1967). And see Bishop v. United States, 71 App.D.C. 132, 135, 107 F.2d 297, 301 (1939). Other types of conduct are also made punishable as first degree murder by D.C.Code §§ 22–2401, 22–2402 (1967).

19. D.C.Code § 22–2403 (1967). And see Austin v. United States, *supra* note 10; Bishop v. United States, *supra* note 18, 71 App.D.C. at 135, 107 F.2d at 301.

20. Belton v. United States, *supra* note 15; Howard v. United States, 128 U.S.App. D.C. 336, 389 F.2d 287 (1967); Green v. United States, *supra* note 16; Sims v. United States, 132 U.S.App.D.C. 111, 405 F.2d 1381 (1968).

21. Emphasis supplied.

22. *Supra* note 16.

23. The same thing was done here.

24. Green v. United States, *supra* note 16, 132 U.S.App.D.C. at 100, 405 F.2d at 1370.

25. *Id.*

26. We followed Green in Sims v. United States, *supra* note 20.

of explanatory or mitigating circumstances, the existence of the malice essential to culpable homicide.

You are instructed as a matter of law that a gun is a deadly weapon.[27]

■ We have thrice had occasion to consider instructions of that import, and in each instance have disclaimed a legally ccompelled inference or presumption of malice from the use of a deadly weapon in a homicide case.[28] In Belton v. United States,[29] we explicated:

Malice is an ultimate fact that can rarely be proved by direct evidence. it is both desirable and necessary to instruct the jury that they may infer the existence of malice from other evidentiary facts, including the deadly nature of the weapon utilized. But that does not mean that 'the law infers' malice from use of a deadly weapon. Malice may be established by reference to either of two standards: One, a subjective standard—whether the defendant actually intended or foresaw that death or serious bodily harm would result from his act; and the other, an objective, "reasonable man" standard—whether the defendant should have foreseen that such result was likely. It is for the jury to determine whether the requisite state of mind or negligent pattern of behavior existed.

The judge erred in stating that 'the law infers * * * malice' from the use of a deadly weapon, and would have

been obligated upon request to substitute instead an instruction charging that the law permits the jury to draw this inference of malice.[30]

## III

■ Our function does not end with recognition of these instructional miscues; there remains the question whether, in the circumstances presented by this litigation, they warrant reversal. That task, one often fraught with difficulty, is compounded here by the absence of protest to the instructions in the trial court, where possibly the mistakes, upon identification, could have been corrected.[31] Appellant can survive the omission of appropriate objections[32] only if we should exert our authority, which he invokes, to notice "[p]lain errors or defects affecting substantial rights."[33]

The problem, however, is not at all new; of late, we have treated, in the plain error context, situations featuring the very same errors.[34] In our Belton[35] and Howard[36] cases, which involved only the instruction that the law infers malice from use of a deadly weapon, we ascertained that the error did not likely produce such prejudice as to signal an application of the plain error rule. On the other hand, in our Green case,[37] where the trial judge gave both that instruction and the instruction equating intentional conduct with malice, the combination of the two missteps steered us to the

---

27. Emphasis supplied. The technique of defining malice in full in the instructions on first degree murder, without repetition in the instructions on second degree murder, is subject to criticism on the ground that the full definition of "malice" relevant to second degree murder contains an objective element—for the case of an act that is so reckless as to indicate a disregard of human life—that is inappropriate for first degree murder with its requirement of premeditation. United States v. Dixon, 135 U.S.App.D.C. 401, 419 F.2d 288 (1969) (concurring opinion).

28. Belton v. United States, *supra* note 15; Howard v. United States, *supra* note 20; Green v. United States, *supra* note 16.

29. *Supra* note 15.

30. *Id.*, 127 U.S.App.D.C. at 204–205, 382 F.2d at 153–154.

31. *Id.* at 205, 382 F.2d at 154.

32. Fed.R.Crim.P. 30.

33. Fed.R.Crim.P. 52(b).

34. See the cases cited *supra* note 20.

35. Belton v. United States, *supra* note 15, 127 U.S.App.D.C. at 205–206, 382 F.2d at 154–155.

36. Howard v. United States, *supra* note 20, 128 U.S.App.D.C. at 340, 389 F.2d at 291.

37. *Supra* note 16.

opposite conclusion, and to a reversal of the conviction.[38] These decisions, and the considerations upon which they were predicated, exert their weight as we ponder the disposition we should make on this appeal.

■ The inquiry here, as it was in the cases cited, is the probable impact, appraised realistically, of the particular instructional mistakes upon the jury's factfinding function. In *Belton*, we examined the faulty instruction, not in isolation but, as always, against the backdrop of related segments of the trial judge's charge, and concluded that it was unlikely that in context the single misstatement led the jury astray.[39] We also felt that since the jury had found Belton guilty of first degree murder, and thus of a premeditated and deliberate killing,[40] it was improbable that the jury could have failed to also find malice.[41] In *Howard*, when we came across the same instruction, we were moved by the fact that "the proof of malice was not weak or equivocal,"[42] and by the further

fact that the error was partially cured by another instruction given by the trial judge.[43] In both cases, it was the union of the recited conditions that left us unpersuaded that we should call forth the plain error rule.[44]

In *Green*, however, we observed that the affirmance in *Belton* and *Howard* "rest[ed] upon the over-all factual situations in those cases,"[45] and we did "not construe the decisions as laying down a binding rule that the error is never reversible unless the subject of objection."[46] Moreover, we reiterate, while *Belton* and *Howard* presented their problems in terms of but one miscue—a lapse in each instance mitigated by other circumstances—in *Green* there were two erroneous instructions on malice. And although Green's conviction of first degree murder necessarily implied affirmative findings by the jury on premeditation and deliberation, we reversed because we could not say that the jury had not followed the incorrect rather than the correct instructions on malice.[47]

38. See text *supra* at note 26.

39. "We have little doubt that if objection had been made this slip of the tongue by a capable trial judge—assuming the reporter heard him right—would have been corrected. To a lawyer, there is an undeniable gulf between 'the law infers' and 'the law permits you to infer'. We think it unlikely that the jury felt obligated by virtue of this simple phrase to find malice if it found defendant had a deadly weapon, particularly since the possibility of such an understanding was undercut by the context of the phrase. We must consider the impact in the court room, how the words sounded to the ear. The charge as heard in the court room did not ring an alarm of error or prejudice to counsel, whose defense rested on appellant's testimony that it was the deceased who brought forth the pistol. This was not only a single phrase, but a phrase uttered in a context provided by the preceding paragraph, which may fairly be described as advising that the instrument or means of the homicide was for the consideration of the jury in determining whether there was a criminal act and in what degree."
Belton v. United States, *supra* note 15, 127 U.S.App.D.C. at 205, 382 F.2d at 154.

40. See D.C.Code § 22–2401 (1967).

41. "Last but not least is the consideration that the charge clearly alerted the jury to the need for finding premediation and deliberation, over and above malice, before bringing in a first-degree verdict. A jury inferring premeditation and deliberation could hardly have failed to infer malice."
Belton v. United States, *supra* note 15, 127 U.S.App.D.C. at 205–206, 382 F.2d at 154–155.

42. Howard v. United States, *supra* note 20, 128 U.S.App.D.C. at 340, 389 F.2d at 291.

43. *Id.*

44. Belton v. United States, *supra* note 15, 127 U.S.App.D.C. at 205–206, 382 F.2d at 154–155; Howard v. United States, *supra* note 20, 128 U.S.App.D.C. at 340, 389 F.2d at 291.

45. Green v. United States, *supra* note 16, 132 U.S.App.D.C. at 99, 405 F.2d at 1369.

46. *Id.*

47. "[I]n concluding that the homicide was first degree murder we cannot know whether the jury were guided by the correct or the incorrect portions of the instructions. If the latter we must assume they felt obliged to determine that the homicide, if unlawful and not in self-de-

In the case at bar, the trial judge's charge contained the same two instructions that occasioned our reversal in *Green* and, unlike any of the three cases cited, both of those instructions were later reread to the jury. What, then, we face is bad advice twice given to the jury to the effect that a wrongful act done intentionally is done with malice, a state of mind which the law presumes from the use of a deadly weapon. As in *Green,* we are unable to derive from the remainder of the judge's charge a rectification of error on such a scale. And, unlike *Belton,* there was no first-degree murder verdict and, unlike *Howard,* no subsequent ameliorative statement by the judge, to reduce the impact of the instructional mistakes. As a last resort,[48] we look then, to the evidence, for the defense as well as for the prosecution, to determine whether appellant's second degree murder conviction finds salvation in the strength of the Government's showing on malice.[49]

## IV

Though, at the trial, appellant stood alone against his accusers, he was entitled to the jury's evaluation of his testimonial account of the shooting, uninfluenced by misleading instructions from the court. And on the testimony appellant gave, the jury could have set-

tled on manslaughter as its verdict on either of two bases. The first would have given but normal operation to well settled principles applicable to homicide in the heat of passion arising suddenly on adequate provocation.[50] By appellant's theory, several persons were drinking and playing dice when an argument arose over participation in the game. When one disputant resorted to fists, the other responded with a pistol, and in the anger of the moment emptied its contents at the victim. The rebuff, the acrimonious words and the subsequent physical assault appellant charged to McQueen might have been sufficient in the eyes of the jury to induce the violent emotional state that serves to reduce homicide from murder to manslaughter.[51] But the jury, compliably with the judge's erroneous instructions, might have felt obliged to presume the existence of malice from appellant's intentional, though possibly impassioned, use of the gun.

The second basis for a possible verdict of manslaughter might have arisen on failure of appellant's claim of self-defense. While the actual verdict—of second degree murder—makes it plain that the jury did not accept that claim in full, a total rejection of appellant's recital of the facts is not nearly so evident.[52] An unprovoked assault by another, such as appellant described, is sufficient cause

---

fense, was of graver degree than manslaughter. The error accordingly was prejudicial, aside from the question whether the repetition of the error referred to in *Belton* and *Howard* should be held ground for reversing in this case." *Id.* at 100, 405 F.2d at 1370.

48. The Government argues that the fact that the trial judge charged extensively on manslaughter should have alerted the jury to the possibility of such a finding so sufficiently as to avoid any prejudice. But the jurors were required, as the judge admonished, to follow the law as charged, and here the charge was erroneous as to the very element—malice—that marks the line of demarcation between second degree murder and manslaughter. Moreover, since the jury was given the full range of possible verdicts from first degree murder to homicide excusable by reason of self-

defense, little room was left for attaching special significance to the judge's inclusion in the charge of manslaughter as a lessor offense.

49. See Howard v. United States, *supra* note 20, 128 U.S.App.D.C. at 340, 389 F.2d at 291.

50. See Hart v. United States, 76 U.S.App. D.C. 193, 195, 130 F.2d 456, 458 (1942); Bishop v. United States, *supra* note 18, 71 App.D.C. at 136–137, 107 F.2d at 302–303; Kinard v. United States, 68 App. D.C. 250, 254, 96 F.2d 522, 526 (1938); Jackson v. United States, 48 App.D.C. 272, 278–279 (1919).

51. See United States v. Hamilton, *supra* note 16, 182 F.Supp. at 551; State v. Michael, 74 W.Va. 613, 82 S.E. 611 (1914).

52. See text *infra* at notes 50–56.

for one to take up his own defense, especially when he finds himself lying on his back before his attacker.[53] At the same time, as the trial judge instructed, the level of the defensive response must be related to the apparent necessities of the occasion, including the degree of force used by the attacker.[54] Here, by appellant's own version, a fistic assault by a smaller man was met with a blazing pistol in the hand of one larger. Such a response may well be deemed disproportionate, but a jury is free to take into consideration not only the magnitude of the attack but also the predicament the accused believes himself to be in.[55] Appellant's jury may have recognized an obstacle to finding self-defense simply from the amount of force appellant used to repel the deceased's attack. And if the jury rejected self-defense just because appellant imprudently misjudged the response necessary in the situation, his offense might well have been manslaughter, arising from the unreasonableness of the judgment he made.[56] Here again, by reason of the faulty instructions on malice, the jury may have felt compelled to leap over manslaughter directly to second degree murder on what may have been only a partial failure of appellant's self-defense claim.

The success of the prosecution hung on the jury's acceptance of the testimony of three witnesses, Mrs. Goodwin, Minor and Bennett. Of these, the first two were by far the most important, and the credibility of each was somewhat tainted. Confessedly, Mrs. Goodwin had been drinking before the fatal episode unfolded and also shortly before she took the witness stand at the trial. Minor, too, had been drinking prior to the homicidal events to which he would later testify. Furthermore, Mrs. Goodwin testified that Minor and McQueen, the deceased, were close friends, and that Minor had told her that he wanted to get even with appellant and would say anything to get him convicted. Minor himself acknowledged at trial a lifelong friendship with McQueen, who, he stated, "was like a brother to me." Minor admitted that he had told Mrs. Goodwin that he "want[ed] to get even with" appellant, but denied saying that he would lie about the affair. Even if the jury discarded the acknowledged statement as a manifestation of bias, the difference between making or not making the unacknowledged statement had obvious portents insofar as the assessment of Minor's credibility was concerned.

The testimony of these two witnesses was, moreover, inconsistent on points that could have had importance to the jury. Although in Mrs. Goodwin's story appellant was never in the dice game, Minor avowed that appellant participated to the tune of losing two dollars, left the game but came back only to be refused readmittance by McQueen. We think a jury inquiring into malice could view differently the frustration of one who was

53. See Harris v. United States, 124 U.S. App.D.C. 308, 364 F.2d 701 (1966); Inge v. United States, 123 U.S.App.D.C. 6, 8–9, 356 F.2d 345, 347–348 (1966). See also the cases cited *supra* note 51.

54. See Brown v. United States, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961, 18 A.L.R. 1276 (1921); Perry v. United States, 137 U.S.App.D.C. 260, 422 F.2d 697 (1969); United States v. Bush, 135 U.S.App.D.C. 67, 416 F.2d 823 (1969); Inge v. United States, *supra* note 53, 123 U.S.App.D.C. at 8–9, 356 F.2d at 347–348; Grant v. United States, 28 App. D.C. 169, 175 (1906); 1 F. Wharton, Criminal Law and Procedure §§ 214, 276 (R. Anderson ed 1957).

55. See Inge v. United States, *supra* note 53, 123 U.S.App.D.C. at 9, 356 F.2d at 348; Marshall v. United States, 45 App. D.C. 373, 384 (1916); Grant v. United States, *supra* note 54, 28 App.D.C. at 175; United States v. Edmonds, 63 F. Supp. 968 (D.D.C.1946). See also the authorities cited *supra* note 54.

56. See Foreman v. United States, 106 U.S. App.D.C. 24, 268 F.2d 899 (1959); State v. Cooper, 273 N.C. 51, 159 S.E.2d 305, 309 (1968); Commonwealth v. Kendrick, 351 Mass. 203, 218 N.E.2d 408, 414 (1966); Etter v. State, 185 Tenn. 218, 205 S.W.2d 1 (1947); 1 F. Wharton, Criminal Law and Procedure § 274 (R. Anderson ed. 1957).

already a loser in the game and one who had not yet tested his luck.

Additionally, Mrs. Goodwin said that appellant had the pistol on his person somewhat earlier during the day when he had shown it to her.[57] This might have suggested to the jury that appellant was carrying the pistol at the time his argument with McQueen arose. Minor, on the other hand, testified flatly that appellant went to his car to get the pistol shortly before he returned to do the shooting.[58] We have no way of knowing whether, by the jury's assessment, these testimonial details harmonized or conflicted.[59] We do know that if they diverged the difference between the two accounts had a conspicuous relationship to the question whether the shooting was so impulsive as to connote manslaughter, or was so much less so as to indicate the malice that makes for murder.

We are mindful of the testimony for the Government that appellant fired the first shot without any prior attack by McQueen, and the last two shots while the latter was in flight. That testimony, however, if believed by the jury, would have sufficed to sustain not only a finding of malice but findings of premeditation and deliberation as well,[60] yet the jury did not return a verdict of first degree murder. Appellant, on the other hand, told the jury that all shots were fired while he was in the throes of an assault by McQueen and a continuing state of passion aroused thereby. The jury had to discount some of the Government's evidence and accept some of appellant's before it could report a verdict of second degree rather than first degree murder. The jury would not have broken new ground had it, under such conditions, returned a manslaughter verdict despite the fact that appellant continued firing at a retreating opponent.[61]

In sum, the Government's case, though rather strong if the testimony of its two prime witnesses was to be fully believed, suffered from conflicting testimonial descriptions as to pre-shooting events that were clearly significant on the question of malice. The contradictions emerged at points at which observant witnesses are not likely to be mistaken, and the credibility of each witness was further tarnished by transpirations bearing directly on testimonial trustworthiness. The jury brought in a verdict of second degree murder only after mature deliberation, during the course of which it requested reinstruction on each of the three degrees of homicide tendered for its consideration. As the trial judge sensed when the request was received, the critical element was malice, the role of which the judge sought to clarify on reinstruction.[62] Notwithstanding that, the man-

---

57. See note 5, *supra.*

58. See text *supra* at note 5.

59. See note 5, *supra.*

60. Compare United States v. Sutton, 138 U.S.App.D.C. 208, 426 F.2d 1202 (D.C. Cir. Nov. 7, 1969) ; Green v. United States, *supra* note 16; Belton v. United States, *supra* note 15, 127 U.S.App.D.C. at 206, 382 F.2d at 155; Bostic v. United States, 68 App.D.C. 167, 94 F.2d 636 (1937), cert. denied, 303 U.S. 635, 58 S.Ct. 523, 82 L.Ed. 1095 (1938).

61. See People v. Keys, 62 Cal.App.2d 903, 145 P.2d 589 (1944) ; Nance v. State, 210 Tenn. 328, 358 S.W.2d 327 (1962).

62. Upon receiving the jury's request for reinstruction, the judge decided to "reinstruct them as given before on the elements [of homicide] and the only change that I would propose is in second degree murder, it refers to malice as explained in first degree murder. There I would propose to actually give them the same reading because I think they were a little baffled apparently from it."

In the original charge, malice was fully defined only in instructions on first degree murder to which all subsequent mention of malice referred back. On reinstruction, the definitions of malice contained in the instructions on first degree murder were essentially repeated in those on second degree.

slaughter issue could not fairly be laid before the jury so long as it labored under a misapprehension, which the new instructions served to deepen, concerning the definition of malice as the one ingredient distinguishing manslaughter from murder. We cannot know precisely what effect the erroneous instructions may have had on the jury but, as it was, the jury chose not to accept the whole of the Government's evidence bearing on the degree of appellant's culpability.

All circumstances considered, we are led to the conclusion that the plain instructional errors we find in this case might well have put substantial rights of appellant in such serious jeopardy as to warrant our estimate of their potential effect on the verdict. And weighing carefully the relevant factors, we find ourselves unable to say with fair assurance that the verdict was not swayed by the judge's instructional errors.[63] With a doubt as grave as that arising on this record as to whether the errors led the jury astray, appellant's conviction of murder cannot stand.

The judgment appealed from, so far as it convicts appellant of murder in the second degree, is accordingly reversed and the case is remanded to the District Court for a new trial on the first count of the indictment[64] unless the Government consents, and the trial court considers it in the interest of justice after hearing from both parties, to enter a judgment of manslaughter.[65]

So ordered.

---

63. See Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); Leigh v. United States, 113 U.S.App.D.C. 390, 391, 308 F.2d 345, 346 (1962).

64. The retrial will, of course, be governed by the limitations imposed by Green v. United States, *supra* note 8, there discussed.

65. Compare Austin v. United States, *supra* note 10, 127 U.S.App.D.C. at 193–194, 382 F.2d at 142–143; Allison v. United States, 133 U.S.App.D.C. 159, 164–166, 409 F.2d 445, 450–452 (1969); United States v. Bryant, 137 U.S.App.D.C. 124, 420 F.2d 1327 (1969); United States v. Comer, 137 U.S.App.D.C. 214, 421 F.2d 1149 (1970).