William J. ELLIS, Appellant,

v.

UNITED STATES, Appellee.

Michael D. BARNES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 11558, 11641.

District of Columbia Court of Appeals.

Argued Nov. 16, 1977.

Decided Dec. 1, 1978.

---

Ladd B. Leavens, Public Defender Service, Washington, D.C., for appellant Ellis. Silas J. Wasserstrom, Public Defender Service, Washington, D.C., also entered an appearance.

Richard E. Galen, Washington, D.C., appointed by the court, for appellant Barnes.

Robert I. Richter, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., and John A. Terry, William D. Pease, and Jason D. Kogan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before KELLY, NEBEKER and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellants Ellis and Barnes were jointly tried before a jury and found guilty of the following offenses: Ellis was convicted of two counts of first-degree murder while armed, D.C.Code 1973, §§ 22–2401, –3202; two counts of first-degree murder, *id.* § 22–2401; one count of felony murder, *id.*,

§ 22–2401; one count of armed robbery, *id.*, §§ 22–3201, –3202; one count of robbery, *id.*, § 22–2901; one count of assault with intent to kill while armed, *id.*, §§ 22–501, –3202; one count of assault with intent to kill, *id.*, § 22–501; one count of assault with a dangerous weapon, *id.*, § 22–502, and one count of carrying a pistol without a license, *id.*, § 22–3204. Barnes was found guilty of two counts of second-degree murder while armed, *id.*, §§ 22–2403, –3202; two counts of second-degree murder, *id.*, §§ 22–3201, –3202; one count of armed robbery, *id.*, §§ 22–3201, –3202; and one count of robbery, *id.*, § 22–2901.

Appellants contend jointly that the trial court committed reversible error by: (1) refusing to sever their cases for trial, and (2) continuing to poll the jury after one juror dissented from a portion of the verdict as announced by the foreman. Appellants further contend that because the government introduced no evidence of a taking or asportation of anything of value, the evidence was legally insufficient to sustain their convictions for robbery, armed robbery, and, in the case of appellant Ellis, felony murder.

Additionally, appellant Barnes contends that the inconsistency of the jury's verdicts requires reversal of his convictions for second-degree murder while armed and second-degree murder, and that the evidence was insufficient to support his convictions on those counts. He also contends that the trial court failed to instruct the jury properly on the requisite element of malice with regard to the second-degree murder counts. Appellant Barnes further

contends that the trial court's refusal to suppress testimony concerning his identification from a photo array was error because the identification resulted from the use of impermissibly suggestive procedures that created a likelihood of mistaken identification. He also asserts that should we find the evidence legally sufficient to sustain a conviction for armed robbery, that conviction nevertheless should be vacated because it merged with his conviction for felony murder. We disagree with all of these contentions and affirm the convictions with the exception of those which merge into more aggravated offenses.[1]

## I

At 9:50 p. m. on January 19, 1976, Jacqueline Brown returned to the apartment she shared with Clarence Green. Shortly before 10:30 p. m., she received a telephone call from appellant Barnes, whom she had known for about two months. While she was on the phone, Green accompanied by Gerald Brown, came into the apartment; she gave him the phone. Green thereafter told Jacqueline Brown that Barnes was coming over and that she should let him in. Both men then left the apartment.

Shortly before 11:00 p. m., Green and Gerald Brown returned to the apartment accompanied by appellants Barnes and Ellis. Ellis was introduced as "Buddy." Jacqueline Brown and Barnes engaged in a conversation while Ellis looked around the apartment. Suddenly, Ellis pointed a pistol at Green's head and said, "I heard about the thing you did in Hampton, Virginia."

---

1. Appellant Ellis also contends, and the government has conceded, that his convictions for first-degree murder, robbery, assault with intent to kill, and assault with a deadly weapon should be vacated because they merge with the more serious offenses of which he was convicted. The same contention is made by appellant Barnes with regard to his convictions for second-degree murder and robbery; the government similarly concedes the validity of those contentions. We agree, *see e. g., Woody v. United States,* D.C.App., 369 A.2d 592, 595 (1977) (robbery is a lesser-included offense of armed robbery); *Bell v. United States,* D.C. App., 332 A.2d 351, 355 (1975) (assault with a

dangerous weapon is a lesser-included offense of armed robbery), and remand the cases with directions to vacate those convictions.

The government also has agreed with appellant Ellis that his felony sentence for carrying a pistol without a license should be vacated because the trial court failed to comply with the requirements of D.C.Code 1973, § 23–111(b). Finding this assertion meritorious, we direct that the sentence on that count be vacated and we remand for resentencing on that charge. *See Smith v. United States,* D.C.App., 356 A.2d 650, 651–52 (1976); *Irby v. United States,* D.C. App., 342 A.2d 33, 41 (1975); *Smith v. United States,* D.C.App., 304 A.2d 28, 34–35 (1973).

Green asked, "What?" Ellis then shot him. Ellis then fired at Jacqueline Brown, wounding her in the arm, as she ran toward the bedroom.

Jacqueline Brown, searching for a gun in the bedroom, heard more shooting and then threw herself against the door when she heard footsteps. Barnes and Ellis forced the door open, knocking her to the floor. Barnes came into the room first and rushed toward the dresser. Ellis stood over Jacqueline Brown and shot her twice, once in the leg and once in the stomach. She saw Ellis and Barnes ransack the dresser (Barnes removed some papers) and then overheard Ellis say, "Man, I thought it was supposed to be more stuff than this in this apartment." Barnes replied, "I've got to get the hell out of here." The two men left the bedroom, and fled the apartment.

After they left, Jacqueline Brown made her way into the living room, where she discovered the lifeless bodies of Green and Gerald Brown. As a result of her wounds, Jacqueline Brown was hospitalized until early February.

A police investigation of the scene revealed that Green's pockets were empty except for one which contained marijuana. Gerald Brown's rear pocket had been pulled out. Several coins were located near the bodies. A small tinfoil package containing marijuana was found on the floor several feet from Green's body. Brown's wallet was in the pocket of his coat, which was on the couch.

The morning after the homicides, Barnes left for Ohio. Sixteen days later, on February 5, he returned to the District of Columbia and surrendered to the police. He identified Ellis as the man responsible for the shootings. Ellis was arrested on February 7. He gave a statement to the police claiming that on January 19, in the late afternoon and early evening, he had attended a wake for his uncle, returned to his apartment, and then proceeded to a downtown nightclub.

Testimony introduced by Ellis at trial indicated that he had attended the wake and returned to his apartment (which he shared with his cousin and his cousin's girlfriend) sometime between 10:30 and 11:00 p. m. Neither the cousin nor his girlfriend knew if Ellis left the apartment after 11:00 p. m., but they testified that he was there when they awakened the next morning.

Barnes testified that on the morning of January 19 he sought unsuccessfully to reach Ellis to ask to borrow his car. That evening, Barnes telephoned Green expressing his desire to purchase some marijuana for an upcoming trip to Ohio. Around 11:15 p. m., Caroline Brooks (Barnes' sister) told Barnes that Ellis was downstairs and wanted to see him. Ellis was accompanied by Green and Gerald Brown; all three men were in Green's car. Barnes traveled with them to Green's apartment where he was to purchase some marijuana. All four men smoked marijuana on the way to Green's apartment.

Barnes went on to testify that when the shooting started he shouted at Ellis to stop. He claimed that he rifled through the dresser in an effort to distract Ellis from noticing that Jacqueline Brown was still alive. Attempting to placate Ellis, he suggested there might be some money in the apartment. To his knowledge, he testified, nothing was removed from the apartment.

## II

We first address appellants' assertion that the jury was improperly polled. After the foreman announced the jury's verdicts, counsel for Ellis moved for a separate count-by-count poll of the jurors for each defendant. The trial court, however, merely repeated the verdicts and asked the jurors seriatim if they agreed with them. The first nine jurors responded affirmatively, but the tenth expressed disagreement. The judge routinely polled juror number ten separately as to each count and each defendant. It thus was discovered that the juror disagreed with the guilty verdict on the count charging Barnes with assaulting Jacqueline Brown with a dangerous weap-

on. The court then polled jurors 11 and 12 as to the overall verdicts. After completing the poll, the trial court directed the jury to resume deliberations on the next morning on the count with respect to which there was disagreement. Before the jury could retire, however, the government moved to dismiss the disputed count against Barnes. That motion was granted, eliminating the need for an further deliberations.

We have stated that "*after* a juror's dissent is clearly registered, *further* polling is unnecessary and, in the absence of a contrary request by defense counsel, is error." *In re Pearson,* D.C.App., 262 A.2d 337, 340 (1970). We condemn continued polling because it "serves no salutary purpose while at the same time it discloses in open court the jury's numerical division and consequently subjects the dissenting juror or jurors to unnecessary coercion." *Kendall v. United States,* D.C.App., 349 A.2d 464, 466 (1975). We have, however, recognized that any jury poll where there is disagreement involves some degree of coercion, and the practical dictates of effective judicial administration require that we overturn a conviction only when "the inevitable effect [of continued polling] was to pressure the [dissenting] juror to conform her vote to that of the majority." *Kendall v. United States, supra,* at 466. *See also Jackson v. United States,* D.C.App., 377 A.2d 1151 (1977). It is settled that even in the potential minefield of a jury poll, the trial court enjoys an appreciable measure of discretion. *See United States v. Brooks,* 137 U.S.App. D.C. 147, 150, 420 F.2d 1350, 1353 (1969); *Williams v. United States,* 136 U.S.App.D.C. 158, 164, 419 F.2d 740, 746 (1969) (en banc). Reversal is warranted only when the trial court abuses its discretion by conducting

itself in a manner that infringes upon the exercise of the jurors' free will.

■ We are satisfied that the polling procedure utilized in this case, while not conducted in strict compliance with the guidelines enunciated in *Pearson, supra,* was noncoercive in nature and did not constitute an undue intrusion into the exclusive province of the jury. This case, unlike *Kendall, supra, Jones v. United States,* D.C. App., 273 A.2d 842 (1971), and *Pearson, supra,* does not present the situation of one juror's being forced to defend her position in opposition to the apparent will of the rest of the jury. Juror number ten was not interrogated further after jurors 11 and 12 had given their responses. The trial court did not in any way attempt to persuade her to alter her vote, and the record reflects no indication that the count-by-count polling of that juror intimidated jurors 11 and 12 into suppressing any disagreement they might have had with the verdicts. We are satisfied that the procedure utilized did not constitute an abuse of discretion, particularly when it is recognized that disagreement existed as to only one count and one defendant in the trial of two defendants on a multi-count indictment.[2]

### III

We turn now to appellants' claims that the court erred in not severing them for trial under Rule 14 of the Superior Court's Criminal Rules.[3]

"The prevailing rule is that defendants charged with jointly committing a criminal offense are to be tried jointly." *Baxter v. United States,* D.C.App., 352 A.2d 383, 385 (1976). The trial court has extremely wide latitude in determining whether to grant a motion for severance, and its determination will not be disturbed on appeal except upon

---

**2.** We note that had the trial court not granted the government's motion to dismiss the contested count, and had the case been returned to the jury, we would have been faced with a situation in which coercion was more likely to have occurred as to the contested count had a verdict of guilty resulted.

**3.** Rule 14 provides in relevant part:

If it appears that a defendant . . . is prejudiced by a joinder . . . of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

a showing of a clear abuse of discretion. *Clark v. United States,* D.C.App., 367 A.2d 158, 160 (1976).

Appellants contend that severance was mandated because their presentation of mutually exclusive defenses posed the danger that the jury would "unjustifiably infer that this conflict alone demonstrate[d] that both [were] guilty." *See Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966).

■■■ We agree with appellants that their defenses were essentially contradictory, with Ellis presenting an alibi defense and Barnes accusing Ellis of masterminding the crime. Nevertheless, "a testimonial conflict between codefendants is not alone sufficient ground to require a separate trial." *Baxter v. United States, supra,* at 385. The testimony of Jacqueline Brown was a searing indictment of Ellis' alibi defense. The strength of her testimony against both defendants persuades us that the jury would not have inferred from the conflict alone that the defendants were guilty. Furthermore, the testimony of appellant Barnes also would have been admissible against appellant Ellis in a separate trial. *See Turner v. United States,* D.C.App., 241 A.2d 736, 738 (1968). These two factors neutralize the claims of prejudice which appellant Ellis has advanced. Similarly, we are not swayed by appellant Barnes' assertion that a severance was required because the evidence against Ellis was far more damaging than the evidence against him, and thus that he was unduly prejudiced in

the joint trial by a spillover of evidence.[4] *See United States v. Gambrill,* 146 U.S.App. D.C. 72, 83, 449 F.2d 1148, 1159 (1971). Barnes never denied his involvement in the crime. No evidence which was introduced by or against Ellis incriminated Barnes more than he would have been incriminated in a separate trial through his own testimony and the testimony of Jacqueline Brown. The mere presence of Ellis at the defense table was not a sufficient factor to warrant a finding of prejudice. The denial of Ellis' and Barnes' severance motions did not constitute an abuse of discretion. *See Clark v. United States, supra,* at 160.

IV

Appellants challenge their convictions for robbery and armed robbery, contending that the government failed to prove three essential elements of those offenses.[5] The crime of robbery is defined as follows:

> Whoever by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or by putting in fear, shall take from the person or immediate actual possession of another anything of value, is guilty of robbery . . . [D.C.Code 1973, § 22–2901.]

Appellants' claims on this issue are founded on the alleged failure of the government to prove the following essential elements of the crime of robbery: (1) the taking and (2) asportation of (3) property of value. *See United States v. McGill,* 159 U.S.App.D.C. 337, 338, 487 F.2d 1208, 1209 (1973).[6] The indictment charged the theft

---

4. Barnes did not request a severance prior to trial in accordance with Super.Ct.Cr.R. 12(b)(5). Nevertheless, we deal with his claim on the merits because, under Super.Ct.Cr.R. 14, the trial court has a continuing obligation to grant a severance of codefendants if, at any time during the trial, undue prejudice to either defendant arises as a result of the joinder of their cases. *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *Evans v. United States,* D.C.App., 392 A.2d 1015, at 1020 (1978); *United States v. Leonard,* 161 U.S.App.D.C. 36, 46, 494 F.2d 955, 965 (1974).

5. As stated in n.1, *supra,* the robbery charges merged into the armed robbery convictions, so the convictions on the former must be vacated.

6. Appellants rely heavily on the *McGill* case. We are not persuaded, however, that the conclusion reached in that case was in accord with the weight of the law in this jurisdiction. In any event, we are not bound by that decision, *see M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971), and there is ample precedent to support a contrary determination in the instant case. *See Bowles v. United States,* 142 U.S.App.D.C.

of money from Clarence Green.[7] The government's evidence on the robbery charges consisted of: (1) the testimony of Jacqueline Brown that Green would not go out without carrying money either in his pocket or in a wallet, and (2) physical evidence that (a) appellants went through the pockets of both Green and Gerald Brown, (b) one of Brown's pockets was turned inside out, (c) a few coins were found scattered near their bodies, and (d) both Green's and Brown's pockets were empty when their bodies were found.[8]

We recognize that the question is a close one. *See Budd v. United States,* D.C. App., 350 A.2d 742, 744 (1976); *Bowles v. United States,* 142 U.S.App.D.C. 26, 28, 439 F.2d 536, 538 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971). Nonetheless, we conclude that the evidence was sufficient to sustain appellants' armed robbery convictions. We base our decision on the following factors: (1) the testimony of Jacqueline Brown indicated that Green normally carried money, (2) the pockets of both of the murdered men had been rifled and change was strewn around the bodies, and (3) according to Jacqueline Brown, after Barnes ransacked the dresser in the bedroom, Ellis complained, "Man, I thought it was supposed to be more stuff than this in this apartment."

Although this evidence is largely circumstantial, no legal distinction exists between the significance of circumstantial and direct evidence. *See United States v. Mackin,* 163 U.S.App.D.C. 427, 439, 502 F.2d 429, 441 (1974), *citing United States v. Fench,* 152 U.S.App.D.C. 325, 333, 470 F.2d 1234, 1242 (1972), *cert. denied sub nom. Blackwell v.*

United States, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973). Furthermore, in evaluating appellants' claims, we "must assume the truth of the Government's evidence and give the Government the benefit of all legitimate inferences to be drawn therefrom." *Curley v. United States,* 81 U.S. App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947); *see United States v. Mackin, supra.* The evidence, taken as a whole, provides a legally sufficient basis for appellants' convictions for armed robbery.[9]

## V

Ellis argues that the government's case against him rested almost entirely on the identification testimony of Jacqueline Brown. He contends that her identification of him was tainted by unduly suggestive procedures utilized by the government during the showing of two photo arrays. We disagree.

On January 20, 1976, Jacqueline Brown was shown an array of the photographs of nine individuals, all of whom were named Michael Barnes. She identified the Michael Barnes who had participated in the carnage at her apartment. On February 6, after Barnes had implicated Ellis, Jacqueline Brown was shown the same array, with the picture of Ellis having been added to the photographs of the eight other Michael Barnes. She then identified Ellis as the gunman.

We recently upheld a similar identification procedure in *Harris v. United States,* D.C.App., 375 A.2d 505 (1977), and the reasoning of that case is equally appli-

---

26, 439 F.2d 536 (1970) (en banc), *cert. denied,* 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971).

7. Appellants were found not guilty of the alleged robbery and armed robbery of Gerald Brown.

8. Perhaps critical to the verdicts of not guilty as to the charged robbery of Brown was the fact that Brown's wallet was found undisturbed in the pocket of his coat, which was on the couch.

9. Appellant Ellis also attacks his conviction for the felony murder of Green on the ground that the evidence is insufficient to support a finding that a robbery was perpetrated or that an attempt was made to perpetrate a robbery. *See* D.C.Code 1973, § 22–2401. We are satisfied, however, that a reasonable person could have concluded from the government's proof that the murders of Brown and Green took place during the commission of a robbery and therefore constituted felony murder. *See Calhoun v. United States,* D.C.App., 369 A.2d 605, 607 (1977), and cases cited therein.

cable here. The record reflects that the witness did not retain a clear memory of the faces in the original array whom she could not identify and that the array consisted of "young black males, none of whom is so distinguishable from any one of the others, that he would particularly stand out." We conclude that the photo array procedures were not so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The testimony relating to the photo identification was properly admitted.[10]

## VI

■ Appellant Barnes alleges that there is a legally insufficient evidentiary basis upon which the jury could have concluded beyond a reasonable doubt that he aided and abetted the murders. Therefore, he contends that his convictions for second-degree murder while armed must be reversed. We disagree.

An individual who knowingly assists a principal in the commission of a criminal act is liable equally with the principal. *Byrd v. United States,* D.C.App., 364 A.2d 1215, 1219 (1976); *see* D.C.Code 1973, § 22–105. We have identified the essential elements of aiding and abetting as follows: (1) an offense was committed by someone; (2) the accused assisted or participated in its commission; and (3) the participation was with

guilty knowledge: *Byrd v. United States, supra; see Blango v. United States,* D.C. App., 335 A.2d 230, 235 (1975). Viewing the evidence, as we must, in the light most favorable to the government, *see Byrd v. United States, supra,* at 1219; *Creek v. United States,* D.C.App., 324 A.2d 688, 689 (1974), and cases cited therein, we conclude that each of these elements was satisfied.

The crimes obviously were committed. Barnes' knowing participation in them was manifested by the following facts: (1) it was Barnes who arranged the meeting with Green; (2) Ellis shot everyone in the apartment except Barnes, and Barnes made no discernible attempt to restrain him; (3) Barnes, with Ellis behind him, forced open the door into the room where Jacqueline Brown had taken refuge; (4) Barnes made no attempt to prevent Ellis from shooting Jacqueline Brown; and (5) Barnes initiated the ransacking of the bedroom dresser. This evidence, taken as a whole, justifiably could have allowed a reasonable juror to conclude beyond a reasonable doubt that Barnes aided and abetted the commission of the crimes.[11] *See Creek v. United States, supra,* at 689; *Crawford v. United States,* 126 U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967); *Curley v. United States, supra.*

## VII

■ Appellant Barnes further cites as reversible error the fact that the trial court did not recite the complete standard in-

---

10. We note, however, that under certain circumstances, the repeated use of an essentially identical photo array might be so suggestive as to violate an accused's due process rights. Our decision today should not be interpreted to encourage the use of such a procedure.

11. Appellant Barnes makes the additional assertion that his convictions for second-degree murder while armed must be reversed because of the inconsistency of the jury's verdicts. He points out that since he was acquitted of first-degree murder, and Ellis was found guilty on those counts, the jury must have concluded that Barnes had not been the accomplice of Ellis in the commission of the homicides. While the jury's verdicts do appear to be inconsistent, inconsistent jury verdicts are not grounds for reversal. *See United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 88

L.Ed. 48 (1943); *Dunn v. United States,* 284 U.S. 390, 393–94, 52 S.Ct. 189, 76 L.Ed. 356 (1932). We previously have noted, and we now reiterate, that "[t]he law correctly recognizes that it must make room for jurors' negotiation and compromise during deliberation." *Steadman v. United States,* D.C.App., 358 A.2d 329, 332 (1976). Therefore, the only issue properly under review is whether the evidence presented adequately supports the jury's verdicts. *See Steadman v. United States, supra.* We answer that question in the affirmative. [For cases which sustain convictions of aiders and abettors for lesser offenses than those of which the principal was convicted, *see United States v. Paszek,* 432 F.2d 780 (9th Cir. 1970); *People v. Folkes,* 71 Mich.App. 95, 246 N.W.2d 403 (1976).]

struction on malice when it charged the jury on second-degree murder. No objection to the instruction was made at trial. The Supreme Court has stated: "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (footnote omitted). This is not such a case.

In determining the possible existence of error, we must compare the instruction under attack with the instruction which should have been given. This comparison, however, may not be performed in a vacuum. It is well established that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughton,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Watts v.*

*United States,* D.C.App., 362 A.2d 706, 709 (1976) (en banc). *See Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 70 L.Ed. 857 (1926).

The malice instruction which was given during the second-degree murder charge, standing alone, might have been inadequate.[12] In issuing this instruction, however, the trial court referred back to its earlier malice instruction which was given during the first-degree murder charge. The previous instruction substantially complied with the standard instruction [see D.C. Bar Ass'n, *Criminal Jury Instructions,* No. 4.23 (2d ed. 1972)], and provided the jury with a comprehensive definition of malice.[13] We do not mean to encourage the use of this referral technique which has come under criticism in the past.[14] Nevertheless, taking into account Barnes' failure to object to the instruction at trial, and evaluating

12. The instruction given was:

Now, malice does not come as I have indicated before, necessarily imply ill-will, spite, hatred or hostility by the defendant or someone whom he aided and abetted, but, indeed, as I have indicated before, malice is a state of mind showing a heart regardless of the life and safety of others.

13. The complete definition of "malice" in the second-degree murder standardized jury instruction (No. 4.23) reads:

*"Malice" does not necessarily imply ill-will, spite, hatred, or hostility by the defendant toward the person killed. "Malice" is a state of mind showing a heart regardless of the life and safety of others,* a mind deliberately bent on mischief, a generally depraved, wicked and malicious spirit. "Malice" may also be defined as the condition of mind which prompts a person to do wilfully, that is, on purpose, without adequate provocation, justification or excuse, a wrongful act whose foreseeable consequence is death or serious bodily injury to another.

*Malice may be either express or implied. Express malice exists where one unlawfully kills another in pursuance of a wrongful act or unlawful purpose, without legal excuse. Implied malice is such as may be inferred from the circumstances of the killing, as, for example where the killing is caused by the intentional use of fatal force without circumstances serving to mitigate or justify the act,* or when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life.

*[In determining whether a wrongful act is done with malice, you may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. However, you should consider all of the circumstances and evidence that you deem relevant in determining whether the Government has proved beyond a reasonable doubt that the defendant acted with the required malice.]*

*If a person uses a deadly weapon in killing another person, you are permitted to draw the inference of malice from his use of such weapon, in the absence of explanatory or mitigating circumstances. You are not required to infer malice from the use of such weapon, but you may do so if you deem it appropriate.*

Use of the bracketed language is discretionary. The italicized portions constitute the instruction as delivered by the trial court to the jury during the first-degree murder charge.

14. The United States Court of Appeals for the District of Columbia Circuit has recognized that this procedure is subject to criticism on the ground that the full definition of "malice" relevant to second degree murder contains an objective element—for the case of an act that is so reckless as to indicate a disregard of human life—that is inappropriate for first degree murder with its requirement of premeditation. [*United States v. Wharton,* 139 U.S.App. D.C. 293, 298 n.27, 433 F.2d 451, 456 n.27 (1970); *see United States v. Dixon,* 135 U.S. App.D.C. 401, 404–05, 419 F.2d 288, 291–92 (1969) (Leventhal, J., concurring).]

the instructions as a whole, *see United States v. Wharton,* 139 U.S.App.D.C. 293, 298–99, 433 F.2d 451, 456–57 (1970), we cannot say that there was a likelihood that the jury was misled to the extent that it was "more probable than not that an improper verdict was rendered." *United States v. Thurman,* 135 U.S.App.D.C. 184, 185, 417 F.2d 752, 753 (1969); *see Lloyd v. United States,* D.C.App., 333 A.2d 387, 390–91 (1975); *Adams v. United States,* D.C. App., 302 A.2d 232, 234 (1973). Accordingly, appellant Barnes' convictions for second-degree murder while armed are affirmed.

### VIII

■ Finally, appellant Ellis contends that his conviction for armed robbery must be vacated because it merges into his conviction for felony murder. We rejected an identical contention involving convictions for rape and felony murder in *Whalen v. United States,* D.C.App., 379 A.2d 1152 (1977). There can be no merger of the subject offenses because the societal interests which Congress sought to protect by enacting § 22–3201 (armed robbery) differ from the societal interests which were meant to be protected by the enactment of § 22–2401 (felony murder). The purpose of the armed robbery statute is to protect individuals from being unwillingly deprived of their personal property through the use of armed force. "The felony murder statute purports to protect human life—it dispenses with the need for the prosecution to establish that the accused killed with a particular state of mind, and instead permits the jury to infer the requisite intent from the fact that a felony was committed." *Whalen v. United States, supra,* at 1159 (footnote omitted). We find nothing in either the armed robbery or the felony murder statute to indicate that Congress intended to vitiate conviction for the underlying crime whenever death resulted during its commission. *Id.; see also* cases cited in *Whalen v. United States, supra,* at 1160 n.9. Accordingly, appellant Ellis' conviction for armed robbery is affirmed.

### IX

We thus affirm appellant Ellis' convictions for two counts of first-degree murder while armed, and for single counts of felony murder, armed robbery, and assault with intent to kill while armed. We also affirm appellant Barnes' convictions for two counts of second-degree murder while armed and one count of armed robbery.

■ We have noted in footnote 1, *supra,* that convictions for a number of lesser-included offenses must be vacated, and that appellant Ellis must be resentenced on his conviction for carrying a pistol without a license. Repeatedly this court is finding it necessary to interject itself into the process of setting aside convictions for lesser-included offenses, as a consequence of which we take this opportunity to stress that these problems should be taken care of at the trial court level without necessitating the intercession of this court. Ideally they should not arise at all, assuming that proper jury instructions are given and followed. If such verdicts nonetheless are returned, the problem should be resolved immediately after the jury's return of its verdicts, when all aspects of the case are fresh in the minds of the trial judge, defense counsel, and the prosecutor. If for some reason that cannot be accomplished, the sentencing hearing provides a second opportunity which could be utilized for such a purpose.

While no problem of the setting aside of a lesser-included offense conviction thus should survive to the appellate level, if it does there should be no need for both sides to brief the issue and rely upon our resolution thereof. When the problem is recognized by appellate counsel (on either side of the case), discussions readily may be conducted, and, if necessary, on appropriate motion we could deem the record to be remanded so as to permit trial court resolution of the situation without delaying the hearing and disposition of the appeal on the merits. *See, e. g., Smith v. Pollin,* 90 U.S. App.D.C. 178, 194 F.2d 349 (1952).