**Rickie READY, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 80–1025.

District of Columbia Court of Appeals.

Argued Dec. 8, 1981.

Decided May 18, 1982.

---

Paul K. Regan, Washington, D. C., appointed by this court, for appellant.

Regina C. McGranery, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry and Steven D. Gordon, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and FERREN and PRYOR, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant, Rickie Ready, of second-degree murder while armed, D.C. Code 1973, §§ 22–2403, –3202, assault with a dangerous weapon, *id.*, § 22–502, and carrying a pistol without a license, *id.*, § 22–3204. The court sentenced him to concurrent prison terms of eight to twenty-four years for the murder, three to ten years for the assault, and one year for the weapons conviction. On appeal, he claims the trial court abused its discretion in (1) failing to sever his trial from that of his codefendant, Henry Fitzhugh,[1] and (2) refusing to admit grand jury testimony of a defense witness who was not present at trial.

As to the first issue, this is a case of allegedly "conflicting and irreconcilable defenses" requiring application of the principle that severance should be granted if "there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Rhone v. United States*, 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966) (per curiam). The second issue primarily concerns the efforts a defendant must make to produce a witness for trial, before the defendant may introduce the transcript of earlier, grand jury testimony into evidence.

Finding no abuse of discretion, we affirm.

I.

According to the government's evidence, on July 13, 1979, as Tyrone Barnett, Paul Fitzhugh, and Andrew Fitzhugh left the home of Barnett's brother on Ainger Place, they saw two men shooting craps. Barnett and Paul Fitzhugh decided to join the game. The other two, Darnell Cooper and Larry Steele, apparently cheated. A fight broke out, and several youths jumped in to help Cooper and Steele. Eventually, Barnett's brother came out of the house to break up the fight, but by that time Fitzhugh and Barnett had fared the worst, and Barnett had lost an almost new, $150 watch.

The next day, Barnett and Paul Fitzhugh made plans to go back for Barnett's watch. Paul Fitzhugh convinced his brother, Henry Fitzhugh, to drive them. When they met Henry Fitzhugh, he was accompanied by three persons: appellant, an unidentified man, and the Fitzhughs' cousin, Alfred Matthews.[2]

According to Tyrone Barnett's testimony, Henry Fitzhugh and appellant displayed guns on the way to Ainger Place. Henry Fitzhugh said, "This is what we have for them." He added, however: "I'm not going to use it, unless they bring out guns." Paul Fitzhugh testified that in the car on the way appellant said (in contrast with Henry Fitzhugh's attitude): "I ain't going up

---

1. The jury convicted Henry Fitzhugh of the same charges. He withdrew his appeal.

2. Initially, Paul Fitzhugh had tried to get Matthews to drive them, but Matthews declined

because he was low on gas. At that time, Paul Fitzhugh had told Matthews they needed "back-up" in reclaiming the watch.

there for nothing.... I'm going to get somebody."

Three eyewitnesses testified for the government about the shooting that occurred after the six arrived at Ainger Place. Darnell Cooper, who had been in the crap game, testified that on the night of July 14 he was outside in front of a house talking with Darryl Woodson, David Wise, and Mandell Cooper when he noticed a "deuce and a quarter" (an Electra 225 car) coming down the street carrying six or seven persons. Darnell Cooper recognized Barnett and Paul Fitzhugh. After telling his brother that he would be back, Darnell Cooper then went home to put on sneakers, for he thought that Barnett and Paul Fitzhugh might try to start another fight. After changing his shoes, Darnell Cooper heard three shots. He said his brother and friends ran into the house through the front door. Then they ran next door. Darnell Cooper followed. At the neighbor's, they discovered that Woodson had been shot. An ambulance took him away.

Tyrone Barnett testified about the shooting from his vantage point in Henry Fitzhugh's car. The group was "cruising" up Ainger Place, looking for the youths whom Barnett and Paul Fitzhugh had fought the day before. Paul Fitzhugh pointed to a group of boys standing on a corner: one was wearing Barnett's watch. Barnett got out of the car to confront the youth. Right away, however, he heard shots; he quickly got back into the car. Barnett then saw appellant "hitting on his gun, trying to get it to operate, or something, cursing the thing" because "it was jammed up on him." Henry Fitzhugh, he said, still was firing. The men who had been standing in front of Ainger Place ran, trying to get into houses. According to Tyrone Barnett, when Henry Fitzhugh and his companions drove off after the shooting, someone in the car said, "I got him. Did you hear him holler, ouch, and grab his back?" Barnett further testified that appellant had said he shot twice and then his gun jammed.

Paul Fitzhugh also testified for the government. He said that after he had spotted one of the fellows with whom he had fought the day before, Henry Fitzhugh stopped the car. As Barnett started to walk over to the youth who had his wristwatch, appellant yelled, "Bust loose" and shot twice. Appellant's gun jammed, and Henry Fitzhugh started firing into the air to scare people. After appellant had fired the first two shots, one man hollered "ouch" and grabbed his back as he ran. Henry Fitzhugh drove away with his passengers. En route, appellant said, "I got him. I got him." [3]

## II.

Henry Fitzhugh and appellant presented substantially different defenses. Fitzhugh's witnesses corroborated government evidence that appellant's gunshots had caused the fatal wound. These witnesses (including Henry Fitzhugh himself) acknowledged that Fitzhugh had been at the scene, but they testified that he only had fired into the air to scare the youths. In sharp contrast, appellant—who did not testify—had a two-fold defense. First, he attempted to show that he was not at Ainger Place on July 14, 1979. Second, he tried to convince the jury that the first gunman—the one who shot Woodson—was Paul Fitzhugh.

A. Henry Fitzhugh's first witness, his cousin, Alfred Matthews, testified that as Tyrone Barnett got out of the car and

---

**3.** The government presented expert testimony as to the cause of Woodson's death. A doctor who had been present at the autopsy testified that two bullets had struck Woodson in his back. One bullet lodged in a muscle; the other passed out of the front of his body having traversed his right lung and killed him. The doctor could not determine whether Woodson's wounds were caused by one or two weapons.

The government's ballistics expert could not determine what type of weapon fired the bullet that lodged in Woodson's body. He testified, however, that the ammunition found at the scene included one bullet that had been fired from a revolver, as well as two spent cartridges and two live rounds from a semi-automatic pistol. The two live bullets showed markings which indicated that, at one time, they had been jammed in a pistol.

walked toward the youth to get his watch, appellant suddenly said, "Look, they trying to run," or, "Look, they running." Appellant then reached into his jacket and fired twice, out the window into the crowd. Then, his gun jammed. After the youths outside had scattered, Henry Fitzhugh fired into the air. Those in the car drove off and appellant said, "I got him, Babe. I made that m_____ f_____ holler."

Paul Fitzhugh also took the stand and confirmed that Henry Fitzhugh had fired into the air.

Testifying in his own defense, Henry Fitzhugh admitted he had driven the car; but he said that as Barnett started to reclaim the watch and the young men began to run, appellant said, "They running, bust loose," and appellant fired twice. Then his gun jammed. Henry Fitzhugh admitted that he had "fired four times up into the air. But, [he] did not go up there with the intentions to killing anybody and [he was] sorry it happened." As Henry Fitzhugh and his companions drove off, appellant boasted, "We got him."

B. Appellant did not take the stand but called six witnesses—four relatives and two close friends of his family—who testified that during the evening of July 14 and the early morning of July 15, 1979, appellant was at 3229 Buena Vista Terrace, attending a birthday party for his brother, Jerry Ready.

Appellant did not limit his defense to an alibi. He also tried to show that Paul Fitzhugh was the one who, along with Henry Fitzhugh, shot at the youths in front of Ainger Place. Appellant's counsel cross-examined the government's and Fitzhugh's witnesses in an effort to show that they were biased in favor of members and friends of the Fitzhugh family. Counsel highlighted the possible motive of these witnesses to point a finger unjustly at appellant, in order to protect themselves, their

relatives, and their close friends. Additionally, counsel for appellant called two eyewitnesses who testified that the first gunman had come out of the car on the passenger side (and thus had not been sitting in what government witnesses had identified as appellant's seat behind the driver, Henry). At a lineup, moreover, one of these witnesses picked out Paul Fitzhugh as the first gunman, and at trial the witness testified that he had not seen appellant in the car but would have seen him if appellant had been a passenger.

Henry Fitzhugh, in rebuttal, called Barbara June Matthews, Paul Fitzhugh's wife, and Kathy Williams, Henry Fitzhugh's fiance, who both testified that appellant had been in the car.

### III.

Appellant maintains the trial court erred in refusing to sever his trial from that of his codefendant, Henry Fitzhugh, because of the prejudice created by the irreconcilable nature of their defenses. On this record the argument is not persuasive.

■ A. Several defendants may be joined for trial pursuant to Super.Ct. Crim.R. 8(b).[4] Indeed, the court favors joinder, for it facilitates the administration of justice by reducing docket congestion, conserving judicial resources, and lessening the burden on citizens called as witnesses. *Jennings v. United States*, D.C.App., 431 A.2d 552, 556 (1981); *see Carpenter v. United States*, D.C.App., 430 A.2d 496, 502 (en banc) *cert. denied*, ‒‒ U.S. ‒‒, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981); *Johnson v. United States*, D.C.App., 398 A.2d 354, 367 (1979).

■ To avoid undue prejudice, however, properly joined defendants may request a severance at any time under Super.Ct.

---

4. Super.Ct.Crim.R. 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Crim.R. 14.[5] Here, appellant unsuccessfully moved for severance on two occasions: once before trial and again during presentation of his defense.[6]

■ We will reverse the denial of a severance motion only for abuse of trial court discretion. *Sweet v. United States*, D.C. App., 438 A.2d 447, 450–51 (1981); *Sousa v. United States*, D.C.App., 400 A.2d 1036, 1041, *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *Johnson, supra* at 367. Appellant specifies one principal reason why the trial court abused its discretion: the joint trial with Fitzhugh was one in which "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty . . . ." *Rhone, supra*, 125 U.S.App.D.C. at 48, 365 F.2d at 981.

Central to this argument is the proposition that when two defendants offer conflicting stories of what happened, there is a risk that the jury will believe, because of the conflict, that both defendants are lying to protect themselves, even if one defendant is telling the truth. *See Williams v. United States*, D.C.App., 382 A.2d 1, 9 n.14 (1978) (hypothesizing the thought processes a juror might follow to infer guilt from a minor inconsistency). It is also true, however, that joint trials almost inevitably will reveal some differences among codefendants' presentations; and, as a general proposition, it is for the jury, not the court, to judge credibility and sort out most of these conflicts. The problem that *Rhone* addresses, therefore, is not the prejudice attributable merely to conflicting testimony. It is, rather, the potential for prejudice from joinder when the defenses themselves are inherently irreconcilable. When that happens at least one defendant assuredly is lying and, for that reason, there is a danger that the jury will believe both are lying.[7]

Analytically, therefore, *Rhone* presents two questions: (1) were appellant's and Henry Fitzhugh's defenses irreconcilable?[8]

---

5. Super.Ct.Crim.R. 14 provides in part:

   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. . . .

6. The second request was linked with appellant's desire for admission of grand jury testimony of Mandell Cooper, an allegedly unavailable witness. *See* Part IV *infra*. Appellant moved for severance when counsel for codefendant Fitzhugh opposed reading the transcript to the jury.

7. "Stated another way, the task of the court is in assessing *the risk* of the jury's being misled into finding guilt from the existence of the conflicting defenses alone." *Johnson v. United States*, D.C.App., 398 A.2d 354, 368 n.11 (1979) (emphasis in original).

8. This court has considered a number of cases in which defenses were held irreconcilable: *Sweet v. United States*, D.C.App., 438 A.2d 447, 450–51 (1981) (one party claims he was coerced by his codefendant and his codefendant claims alibi); *Ellis v. United States*, D.C. App., 395 A.2d 404, 409 (1978) (defendant claiming innocent presence points finger at defendant claiming alibi), *cert. denied*, 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979); *Bax-*

ter v. United States*, D.C.App., 352 A.2d 383, 385 (1976) (one defendant claims innocent involvement at codefendant's direction); *Turner v. United States*, D.C.App., 241 A.2d 736, 737–38 (1968) (defendant's testimony that codefendant was present at scene of crime conflicts with alibi codefendant wanted to introduce). *See also United States v. Brooks*, 185 U.S.App.D.C. 267, 272, 567 F.2d 134, 139 (1977) (defendant contradicts codefendant's claim that he neither owned nor possessed shotgun); *United States v. Leonard*, 161 U.S.App.D.C. 36, 47–48, 494 F.2d 955, 966–67 (1974) (witnesses of defendant claiming innocent presence point finger at codefendant claiming alibi); *United States v. Hurt*, 155 U.S.App.D.C. 217, 222, 476 F.2d 1164, 1169 (1973) (per curiam) (same through defendant's own testimony about his codefendant).

   We also have reviewed cases alleging irreconcilable defenses where we held to the contrary: *Jennings v. United States*, D.C.App., 431 A.2d 552, 556 (1981) (no evidence that defendant claiming innocent presence points finger at defendant claiming alibi); *Sousa v. United States*, D.C.App., 400 A.2d 1036, 1042, *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979) (both defendants claim innocent presence); *Williams v. United States*, D.C. App., 382 A.2d 1, 3, 8–9 (1978) (discrepancy as to tangential matter only; defendant who claims he engaged in consensual intercourse asserts that co-defendant was not present dur-

(2) If so, was there a danger that the jury unjustifiably would infer that this conflict alone demonstrated both were guilty?

■ B. As to the first, at the pretrial hearing the court asked in what way appellant's defense would conflict with Fitzhugh's. Counsel replied Fitzhugh would testify that he shot into the air while appellant shot the victim. Appellant, in sharp contrast, would present evidence that he had not been at the scene of the crime. Obviously, a defense of innocent presence does not conflict with a codefendant's alibi defense when the first accused does not place his codefendant at the scene of the crime. See Jennings, supra at 556. Where, however—as in this case—a defendant claiming innocent presence implicates a co-defendant who claims he was elsewhere, the two defenses are irreconcilable. See Sweet, supra at 450–51; Ellis v. United States, D.C.App., 395 A.2d 404, 409 (1978), cert. denied, 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979).

Having found appellant's and Fitzhugh's defenses irreconcilable, the court evaluated, both before and during trial, whether prejudice from joinder was likely to affect the outcome. Twice the court ruled it would not. In so ruling, the court had to determine whether there would be available at trial enough independent evidence of appellant's guilt—beyond that required for the government to survive a motion for judgment of acquittal [9]—so that the court reasonably could find, with substantial certainty, that the conflict in defenses alone would not sway the jury to find appellant guilty.

■ Before trial, it was clear that numerous witnesses would testify about appellant's presence at the scene and his involvement in the shooting. At trial, in addition to Henry Fitzhugh, five witnesses—Tyrone Barnett, Paul Fitzhugh, Alfred and Barbara Matthews, and Kathy Williams—testified that appellant was in the car. Tyrone Barnett, Paul Fitzhugh, and Alfred Matthews also testified that they saw appellant shoot at the youths. Given that three government eyewitnesses identified appellant as the gunman, and that these witnesses had no perceptible reason to single out appellant for blame (instead of the unidentified person who sat beside him in the car), the court did not abuse its discretion in concluding that the jury would not infer guilt from the fact of conflicting defenses alone.[10] The

ing sexual encounter). See also United States v. Halderman, 181 U.S.App.D.C. 254, 294, 559 F.2d 31, 71 (1976) (en banc) (per curiam) ("The defenses of the co-defendants were simply not at the requisite level of conflict. The jury could have accepted or rejected both.") cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); United States v. Ehrlichman, 178 U.S. App.D.C. 144, 163, 546 F.2d 910, 929 (1976) ("no logical inconsistency in the jury's acceptance of defenses presented by" all defendants; other defendants did not allege Ehrlichman approved of surreptitious entry), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977); United States v. Bolden, 169 U.S.App.D.C. 60, 69, 514 F.2d 1301, 1310 (1975) (both defendants claim they were not at scene of crime; "defenses are tangential to each other, not on a collision course").

9. "The inquiry is not simply whether there is sufficient competent evidence to sustain the conviction. Conflicts in defendant's evidence occur after the government has rested. Thus, a condition precedent for the existence of a Rhone problem is the government having presented a sufficient case to sustain a conviction if obtained." Johnson, supra at 368 n.11.

10. Subsumed under appellant's Rhone argument, rather than advocated independently, was appellant's concern about testimony at the joint trial, including inculpatory hearsay, that would not be admissible against him at a separate trial. See generally Carpenter v. United States, D.C.App., 430 A.2d 496 (en banc), cert. denied, —— U.S. ——, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981); Sousa, supra at 1043. For example, at the pretrial hearing appellant argued that he would be prejudiced if the jury learned from Tyrone Barnett that, on the way to Ainger Place, the codefendant had said, "We're going to cap them." The court's refusal to grant a severance on this ground was proper, for even at a separate trial this hearsay statement would be admissible against appellant as a statement of a codefendant made during the course and in furtherance of the crime. See Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963); Campbell v. United States, 415 F.2d 356, 356–57 (6th Cir. 1969). At trial, in fact, appellant's counsel was the first to introduce the statement in order to shift blame from appellant to Henry Fitzhugh.

The trial court was particularly sensitive to the risk of prejudice from hearsay statements

cumulative testimony of these eyewitnesses constituted independent evidence sufficient to outweigh that possibility.[11] *See Sweet, supra* at 451 (strong incriminating evidence, including identification by victim, assured that jury did not improperly find guilt based on joinder); *Ellis, supra* at 409 (strong testimony by one of the victims outweighed prejudice); *Clark v. United States,* D.C.App., 367 A.2d 158, 160 (1976) (per curiam) (overwhelming eyewitness testimony outweighed prejudice resulting from joint trial); *Turner v. United States,* D.C. App., 241 A.2d 736, 738 (1968) (strong corroborating eyewitness testimony rendered harmless any prejudice that might have resulted from joinder).[12]

Accordingly, the trial court did not abuse its discretion in denying appellant's motions for severance.

## IV.

Appellant also argues that the trial court erred in refusing to admit into evidence a transcript of Mandell Cooper's grand jury testimony. We disagree.

The procedural machinations involved in locating Mandell Cooper were an important consideration in the trial court's decision not to admit his grand jury testimony. On July 1, 1980, all parties announced they were not ready for trial because of problems in locating key witnesses. Later that morning, the government and Henry Fitzhugh's counsel said they were ready to proceed, but appellant's counsel stated he was not ready because Mandell Cooper still was missing. Counsel, however, could not assure the court that Cooper had been subpoenaed. Counsel said he had "every reason to suspect that the witness was subpoenaed but [did not] have any firsthand knowledge of it." The court asked counsel whether he had reason to believe that Mandell Cooper would be available at trial.

> COUNSEL: Oh, Your Honor, I have reason to believe he will be here, because my investigator took a statement from him and my investigator is instructed to

---

that would not be admissible against appellant at a separate trial. During trial, for example, the court strictly limited the government's examination of Kathy Williams concerning statements made by Henry Fitzhugh. The trial court met its "continuing obligation to monitor for prejudice and to sever . . . where necessary to avoid prejudice. . . ." *Sousa, supra* at 1041 (citing *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960)); *see Leonard, supra* 161 U.S.App.D.C. at 46, 494 F.2d at 965 (1974); *United States v. Wilson,* 140 U.S.App.D.C. 220, 225–26, 434 F.2d 494, 499–50 (1970).

11. Appellant argues that the testimony of these witnesses does not constitute independent evidence of guilt because they were biased in Henry Fitzhugh's favor (in contrast to the unbiased witnesses appellant called to support his argument that Paul Fitzhugh was the first gunman). Appellant misunderstands the requirement here. The five government eyewitnesses need not have been strangers to codefendant Fitzhugh in order to provide substantial independent evidence of appellant's guilt. The bias of witnesses, of course, should be considered by the trial judge when weighing the value of their testimony, keeping in mind the countervailing consideration that bias can be elicited on cross-examination for the jury to consider.

12. Appellant makes a second argument under *Rhone v. United States,* 125 U.S.App.D.C. 47, 365 F.2d 980 (1966) (per curiam). Citing *Unit-* *ed States v. Hines,* 147 U.S.App.D.C. 249, 267, 455 F.2d 1317, 1335 (Bazelon, J., dissenting) *cert. denied,* 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *Cross v. United States,* 118 U.S.App.D.C. 324, 326–28, 335 F.2d 987, 989–91 (1964); and *DeLuna v. United States,* 308 F.2d 140 (5th Cir. 1962), he claims that the jury would draw a substantially prejudicial inference from his election not to testify while his codefendant did. Appellant misinterprets the cases. In *Cross,* appellant was prejudiced from joinder of counts, not defendants; he wished to testify as to one count and not the other but was prevented from doing so. Furthermore, contrary to appellant's implication, Judge Bazelon in *Hines* and the court in *DeLuna* did not state that severance is required whenever one, but not all, codefendants choose to testify. Rather, these opinions stand for the proposition that comment by opposing counsel or the government on a defendant's decision not to testify impermissibly prejudices the rights of the silent defendant. The court in *Rhone, supra* 125 U.S.App.D.C. at 48, 365 F.2d at 981, stated that "[p]rejudice from joinder of defendants may arise . . . where only one defendant testifies *and urges the jury to draw an adverse inference from his co-defendant's silence."* (Emphasis added; citations omitted.) Appellant fails to demonstrate that the second part of this test was met.

subpoenae the witness, and I expect that Mr. Dicholson did so. I have reason to believe he did so, because it would be his standard procedure to subpoenae all witnesses that he's been instructed to—

COURT: I just don't want a misunderstanding on this when we get to the defense case and this witness is not available. I don't want there to be any misunderstanding that we've started this trial with the idea that if this witness is not available at the time that we are going to continue this, and there's no basis for that been presented to the court.

THE COUNSEL: I understand the Court's position, Your Honor. Your Honor must understand mine. This witness is a Brady witness presented to me by the United States. The witness was at the scene of the crime and would testify— would give testimony that would tend to exculpate Mr. Ready.

COURT: Well, that's fine. But it's not my responsibility to go out and get him. It's my responsibility to proceed with trial with the witnesses that you have and issue attachments for those that you have subpoenaed who are not here.

A week later during the trial, appellant's counsel asked for a copy of Mandell Cooper's grand jury testimony for use as substantive evidence if Cooper did not appear. The court questioned whether the testimony could be used since appellant had failed to establish Cooper's unavailability. The court then asked what efforts counsel had made during the week to locate the witness. Despite the court's clear statement on July 1, 1980 that appellant's counsel had the responsibility for attempting to locate Cooper, counsel never served the subpoena issued on July 1. The court issued another forthwith subpoena on July 7.

On July 8, appellant moved to have the transcript of Mandell Cooper's grand jury testimony read to the jury, still claiming

Cooper was unavailable. The court denied this motion. The court recognized that counsel had sent an investigator to find the witness several times; however, the court believed that counsel deliberately had not tried to determine the proper address of the witness. (Even though counsel doubted that his investigator had the proper address, counsel waited six days before asking the witness' brother, who was in court during the entire period, where the witness might be found.) The court summarized its concern as follows:

[T]he critical aspect of this is that the Court has been troubled by the persistent efforts to get in secondary evidence or hearsay evidence in reference to this witness. The Court is not at all convinced of the bona fide efforts to locate this witness and make this witness available. To the contrary, this Court believes on the sum of this record and in all the matters before it and its observations of these proceedings that there has been a great[er] effort exerted in attempting to lay a foundation to get in the secondary evidence than there has been to obtain the witness for purposes of testimony.

The Court believes that the defendant believes that this witness would not be credible; that he probably has impeachable convictions, and that as a tactical decision [counsel attempted] to establish a record that would support the admissibility of a secondary evidence, more so than an effort to make the witness available.

The court concluded that appellant had not established a good faith effort to make Cooper available. The court accordingly refused to admit the transcript of Cooper's grand jury testimony.

Appellant argues that Cooper's testimony was admissible under D.C.Code 1973, § 14–303.[13] He also claims that the court's ruling violated the Confrontation Clause of the Sixth Amendment and his due process rights under the Fifth Amendment. We are not persuaded.

13. D.C.Code 1973, § 14–303 provides:
    When a party, after having testified at a time while he was competent to do so, dies or becomes incapable of testifying, his testimony may be given in evidence in any trial or hearing in relation to the same subject-matter between the same parties or their legal representatives, as the case may be; and in such a case the opposite party may testify in opposition thereto.

■ D.C.Code 1973, § 14–303, by its terms, applies only to the testimony of a party, not to testimony of a non-party witness. *See United States v. Franklin*, 235 F.Supp. 338, 340 (D.D.C.1964). Furthermore, the testimony is not otherwise admissible under the exception to the hearsay rule for prior recorded testimony, *see Alston v. United States*, D.C.App., 383 A.2d 307, 315 (1978), for, as the trial court found, appellant failed to show that Cooper was unavailable. *Cf. Ohio v. Roberts*, 448 U.S. 56, 74–75, 100 S.Ct. 2531, 2543–2544, 65 L.Ed.2d 597 (1980) (prosecution carried burden of showing witness was unavailable). We will reverse such a factual finding only if the determination "is plainly wrong or without evidence to support it." D.C.Code 1981, § 17–305. *See United States v. Bowman*, 197 U.S.App.D.C. 246, 253, 609 F.2d 12, 19 (1979) (upholding trial court determination that witness was unavailable); *O'Connor v. United States*, 137 U.S.App. D.C. 76, 77, 420 F.2d 644, 645 (1969) (per curiam) (same); *United States v. Bell*, 500 F.2d 1287, 1290 (2d Cir. 1974) (trial court should determine, in first instance, whether witness is unavailable; appellate court should "not be quick to overturn such a finding"). The court's finding here is supported by the evidence.

■ As to the constitutional arguments,[14] appellant would have us turn his right to present defense witnesses into an absolute right to disregard the court's evidentiary rules. The court did not deny appellant the right to present a witness but only the transcript of testimony by a witness who may well have been available if appellant diligently had looked for him.[15] As the Supreme Court has noted, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). The court need not permit evasion of its evidentiary rules when appellant seeks to admit hearsay, not out of necessity but as a strategy to prevent government cross-examination.[16]

## V.

In summary, the trial court did not abuse its discretion when it refused to sever appellant's trial from that of his codefendant and declined to admit the grand jury testimony of Mandell Cooper. Accordingly, we affirm appellant's convictions for second-degree murder while armed, assault with a dangerous weapon, and carrying a pistol without a license.[17]

*Affirmed.*

---

**14.** Appellant cites *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (per curiam); *Cool v. United States*, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972) (per curiam) and *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) in support of his argument. These cases support the principle that the state may not deny appellant the right to present his evidence. They do not, however, hold that the state must disregard its evidentiary rules where they do not bar relevant evidence but merely govern the form in which the evidence must be presented by favoring live testimony over hearsay.

**15.** *Compare* the following cases cited by appellant: *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980) (court erred by excluding live testimony that might exculpate defendant); *Pettijohn v. Hall*, 599 F.2d 476 (1st Cir.) (habeas granted where defendant prevented from calling eyewitness), *cert. denied*, 444 U.S. 946,

100 S.Ct. 308, 62 L.Ed.2d 315 (1979); *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir. 1978) (habeas granted where accused prevented from calling psychiatric expert), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

**16.** In any event, Mandell Cooper's grand jury testimony did not exculpate appellant. He testified that he had seen Tyrone Barnett get out of the car and reach under his coat. Cooper, however, did not see who shot at him and his friends, since he was running away from the car at the time of the shooting.

**17.** Appellant also claims that his conviction must be reversed because the trial judge misspoke when giving an instruction, saying "[e]very defendant in a criminal case has the absolute right to testify." This was a slip of the tongue to which appellant's counsel did not object and which, in the context of all the instructions, was not plain error. This claim accordingly has no merit.